307 So.2d 203 (1975)
George W. CORNWELL, Petitioner,
v.
UNIVERSITY OF FLORIDA et al., Respondents.
No. T-81.
District Court of Appeal of Florida, First District.
January 23, 1975.
*205 Michael L. Bryant, Gainesville, for petitioner.
Thomas S. Biggs, Jr., Gainesville, Herbert D. Sikes, Charles Miner, Jr., John D. Carlson, Tallahassee, and James S. Quincey, Clayton, Duncan, Johnston, Clayton, Quincey, Ireland & Felder, Gainesville, for respondents.
BOYER, Acting Chief Judge.
We here consider a Petition for Writ of Certiorari by which review is sought of various proceedings culminating in Petitioner being denied tenure at the University of Florida and his employment being terminated.
Petitioner was employed on a one-year contract as an associate professor at the University of Florida (University) in February of 1967. He was re-employed by successive one-year contracts until he was notified on or about January 13, 1972, by the Director of the School of Forest Resources and Conservation (SFRC) that he would not be recommended for tenure at the University and that his employment would terminate on June 30, 1973. Such notification followed a meeting of the tenured faculty of his department, pursuant to University regulations, at which meeting that faculty voted not to recommend that Petitioner be granted tenure.
Following various communications with the President of the University, Petitioner filed a petition with the University Academic Freedom and Tenure Committee (AFTC) alleging, among other things, suppression of his academic freedom and denial of his constitutional rights of freedom of speech. The petition further alleged denial of due process; an expectancy of continued employment; unconstitutionality of the criteria of the University determining eligibility for tenure; and denial of equal protection of the law because the University would not pay for Petitioner's private counsel fees.
Formal hearings before the hearing panel of AFTC were commenced on June 2, 1972 and were completed on December 17, 1972, during which time more than 175 hours of public adversary hearings were held. The AFTC found no suppression of Petitioner's academic freedom; no denial of his constitutional right of freedom of speech; denied his request for counsel fee for his private attorney; found no denial of due process; ruled that he did not have an expectancy of continued employment; and held that the criteria for determining eligibility for tenure were constitutional. It issued its findings and recommendations to the President of the University on January 30, 1973 and, at the request of the President, a supplement thereto on February 22, 1973.
The President, on behalf of the University, issued his decision on February 23, 1973, in which he accepted the factual findings of the committee, but declined to accept all of its recommendations.
After the decision of the President, Petitioner, by letter to the chairman of Respondent Board of Regents (Regents), sought review of the decision of the President. That request was referred to Chancellor Mautz. On March 16, 1973 the Chancellor responded to Petitioner's request by advising him that the rules and regulations of the Regents did not provide for it to hear the matter and that final administrative determination of the employment status of a non-tenured faculty member rested with the President of the University.
Petitioner then filed this Petition for Certiorari, joining as parties the University, AFTC, President of the University, John L. Gray as Director of SFRC, and Regents. Following a hearing before this Court on Motions to Dismiss, this Court entered an order dismissing all parties except *206 Respondent University and Respondent Regents.
Petitioner raises six distinct points for our consideration.
First, Petitioner urges that he had a property interest in re-employment and that he was deprived on termination[1] of employment of liberty and due process in administrative proceedings.
The AFTC rejected Petitioner's claim that he had a property interest in the form of an expectation of continued employment at the University, citing Perry v. Sinderman[2] and Board of Regents of State Colleges v. Roth[3], and further that Petitioner had failed to prove that he had an expectation of continued employment. Its report to the President stated:
"We ruled that under the doctrine of these cases Dr. George W. Cornwell simply had a probationary appointment * * *".
We find that the evidence before AFTC clearly supports its decision that Petitioner did not have a reasonable expectation of continued employment at the University at the time he was notified in January of 1972 that his contract would not be renewed after June 30, 1973. His own testimony on cross examination refutes any such expectancy. On November 2, 1971 he told the President of the Florida Chapter of the Wildlife Society in a letter that he intended to resign from the University of Florida during the 1971-1972 academic year "principally because I can no longer encourage students to enter this program". His testimony revealed that there were no false promises or pretenses which caused him to go to the University initially and that he did not go to the University with the expectation that he would be granted tenure. Although Petitioner had repeatedly been requested to develop a formal research program for the five years while at the University, he had not submitted a single project that met the qualifications of a formal research project. Dissension between Petitioner and other faculty members existed as early as June of 1970. He testified that he felt that the 16 month period which elapsed between the time of his initial notice and termination was "adequate time for a professional to relocate." In a conference with Director Gray in June of 1970, concerning tenure at the University, Petitioner was advised that the Director felt that if a vote was taken at that time it would be "close". As early as June of 1970 Petitioner was aware that the faculty felt his outside activities detracted from his performance as a University professor. Further, in June of 1970 Petitioner had a higher priority on developing a school of natural resources than developing the wildlife program, the job for which he had been employed. He became angry because the Director refused to admit two students to the school's graduate program and resigned from the Graduate Program Committee. In February of 1971 Petitioner requested permission to go on a halftime status in order to go into outside consulting work. In February of 1971 he further requested to be relieved of all research responsibilities in order that he might be relieved of the problems which existed concerning his failure to develop a formal research project. In March of the same year he applied for a job at Utah State University. In November of 1971 Petitioner told the Director and the faculty of his school that he intended to resign from the University of Florida.
In addition to the testimony of Petitioner himself, Professor Miller, a tenured faculty member, testified that he told Petitioner in 1970 that in his opinion Petitioner would not get a majority of the faculty *207 vote for tenure if the question were then presented. Dr. Swinford, another tenured faculty member and Assistant to the Director, testified to conflicts over what he termed irresponsible counseling procedures by Petitioner. Dr. Gray, Director of SFRC, testified that Petitioner was hired on a probationary basis and that there was no promise to him that his contracts would be renewed from year to year. He also testified that although part of Petitioner's responsibilities included the development of a formal research project approved and accepted by the Experiment Station for integration into its program, Petitioner never satisfied such responsibilities even though he was reminded and requested to do so several time, including eight written communications. Dr. Gray also advised Petitioner in June of 1969 and in May of 1970 that the faculty was seriously divided over whether to grant him permanent status. Petitioner's director also tried to counsel him out of the University and encouraged him to apply for a job at another institution. The Director was advised by Petitioner in November of 1971 that Petitioner intended to resign and to go into business as an ecological consultant with Ecoimpact, Inc., a corporation later organized by Petitioner in which he was the principal stockholder.
Although it is difficult for us to understand how Petitioner logically contends that he had a reasonable expectation of remaining at the University, we must assume from the events giving rise to this review that he had a personal desire so to do. In Orr v. Trinter[4] the court carefully pointed out the distinction between a personal desire and a reasonable expectancy of continued employment, stating:
"We assume from the filing of the instant action that he had a personal desire and expectation to continue his employment as a teacher at Walnut Ridge High School. Personal desire and expectation, however, are not the equivalent of expectancy of reemployment in contemplation of the law." (444 F.2d at page 133; emphasis added)
The distinction was applied in Board of Regents of State Colleges v. Roth, supra, wherein the Supreme Court stated:
"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, indeed, have a legitimate claim of entitlement to it." (408 U.S. at page 577, 92 S.Ct. at page 2709)
Petitioner cites Greene v. Howard University[5], a case involving a university with a tenure system and a probationary period similar to the University of Florida. That case involved failure of the university to give appropriate advance notice of non-renewal and the facts are clearly distinguishable from the case sub judice. There, the Howard University Faculty Handbook provided that notice of non-reappointment after June 30 of a given year should be given not later than December 15 of the preceding year and that the Board of Trustees would give such notice directly following its meeting in January of such year, except for teachers on one-year appointments whose dean would notify them not later than March 15 and the Trustees would notify immediately following its meeting in April. The usual practice was to notify nontenured faculty members by January or April depending on the length of appointment. The court there found that because of such rules and practices, "a faculty member if not finally informed by April 15 (with preliminary notice by March 15) that his contract was not to be renewed, had legitimate reason to believe that he could rely on returning to Howard the following semester." Notwithstanding such rules and practice, the University notified the professor on June 20 that he would not be reappointed after his contract *208 expired ten days later on June 30. Such inadequate notice was given following the professor's participation in campus disorders. Such notice was also given in spite of the facts that on March 15 the professor had been recommended for an extension of a two-year term; as a result of being denied a request for a one-year leave of absence because his services were needed at the University he had rejected an offer of a position with the Southern Teaching Program; on May 5 his Department Chairman had given him a "good" rating; on May 22 the Chairman of his Department had assigned him a course for the fall semester and had requested he compile a reading list; and on June 2 the Director of the Summer School had recommended that he be appointed to the staff of the summer session. Under those circumstances (which are clearly distinguishable from those sub judice) the court found that a contractural relationship existed because of the acts of the officials of the University and because of its failure to give notice as provided in the written policy provisions under which the professor was hired. There the court ruled that the non-tenured professor was entitled to a hearing under those circumstances where the University had "abruptly changed its mind about his reappointment".
Pred v. Board of Public Instruction of Dade County, Florida[6] and Thaw v. Board of Public Instruction of Dade County, Florida[7], cited by Petitioner, are consistent with other cases holding that a professor may acquire a right to a hearing because of a reasonable expectation of continued employment. However, the Fifth Circuit Court of Appeals, finding that such teachers were in the third year of the statutory three year probation period before they were eligible for continuing contracts, held that they had no right to re-employment. Thus, that court has held that where a teacher is in the third and final year of a three year probationary period before being eligible for a "continuing contract", which is tantamount to "tenure", no right to re-employment exists. In Thaw v. Board of Instruction, supra, the court, refusing to require a hearing, found that the complainant "offered no proof of any reasonable expectation of re-employment", and although he had alleged that "he was discharged because of a personal disagreement with his principal, the record discloses that the principal recommended the non-renewal of appellant's contract because appellant was performing his teaching duties unsatisfactorily."
Ferguson v. Thomas[8], is of little help to Petitioner because it involved a teacher with nine years in an institution without a tenure program and with no procedure in its rules for termination. The court found that under the prevailing practice of the institution a decision not to offer such an instructor a renewal contract of employment required a showing of cause.
Lucas v. Chapman[9] and Perry v. Sinderman, supra, also relied on by Petitioner are each factually distinguishable. The former involved a teacher with 12 years employment in a non-tenured system. The latter involved an institution, unlike the University of Florida, which had no formal contractual tenure program, yet it had what the court referred to as a "de facto" tenure program and the professor's ten years of continuous service within the system gave him de facto tenure under the provisions of the College Faculty Guide and the rule promulgated by the Coordinating Board of the Texas College and University System, providing that a teacher employed in the college or university system for seven years or more had a right not to be dismissed without a statement or reasons and a hearing. There, although the court ruled that a mere subjective expectancy is not *209 protected by procedural due process, it stated that:
"* * * there may be an unwritten `common law' in a particular university that certain employees shall have the equivalent of tenure. This is particularly likely in a college or university, like Odessa Junior College, that has no explicit tenure system even for senior members of its faculty but that nonetheless may have created such a system in practice." (408 U.S. at page 602, 92 S.Ct. at page 2700.)
The University of Florida, on the other hand, has an explicit written tenure program incorporating therein a probationary period. Petitioner has no contractual right to re-employment nor does he have such right under the rules and policy of the University of Florida, nor under any provision of the laws of the State of Florida. Based upon the applicable law and the evidence before it the AFTC was eminently correct in finding that Petitioner had failed to prove that he had an expectancy of continued employment.
We now consider Petitioner's contention that the administrative decision not to re-employ him and not to recommend tenure deprived him of liberty in violation of the Fourteenth Amendment of the Constitution of the United States. The Supreme Court in Board of Regents of State Colleges v. Roth, supra, held that the non-retention of a non-tenured faculty member whose contract is not renewed is not a deprivation of "liberty" protected under the Fourteenth Amendment. The court said:
"Whatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest.
* * * * * *
"It stretches the concept too far to suggest that a person is deprived of `liberty' when he simply is not rehired in one job but remains as free as before to seek another." (408 U.S. at page 575, 92 S.Ct. at page 2708)
Petitioner was given a sixteen month notice before his termination which he himself testified he felt to be "adquate time for a professional to relocate". There is no evidence that Petitioner was deprived of employment elsewhere, that he was restricted in any way whatsoever from seeking employment elsewhere or that he was deprived of "liberty" in the loss of any other job because of the notice of nonrenewal given by the University. The record is equally devoid of evidence that the notice of nonrenewal (or any of the acts of Respondents) restrained or interfered with Petitioner's right to contract with others, or with his right to engage in any of the common expectations of life, or to acquire any useful knowledge as prohibited by the Roth decision.
We here note a distinction between the notice of nonrenewal and the subsequent reasons given therefor which reasons were required to be given by the AFTC after Petitioner filed his petition asking for a public hearing, and the testimony, both on direct and on cross examination, of the witnesses who appeared before the committee. In the Roth case it was held that if a University discharges a professor on charges of dishonesty or immorality or under circumstances where his good name, reputation, honor or integrity is at stake, he is entitled to a hearing in order to clear his name. Sub judice Petitioner was given more than 175 hours of hearings which, at his request, were public rather than closed, although he had a right under the University regulations to have the hearing closed. It was only after his request for a public hearing that the matters which he alleges deprived him of "liberty" were made public. The record also reflects that most of the testimony before the AFTC concerning Petitioner's integrity and motives came on cross examination of Petitioner himself; or from adverse witnesses Miller and White called on behalf of Petitioner; or *210 from the testimony of other witnesses given to refute the testimony of Petitioner about events and occurrences.
A professor is, and should be, entitled to a hearing if his reputation, good name, honor or integrity has been attacked by University officials in his nonrenewal notice. However, he will not be heard to complain if the sworn testimony of witnesses at such hearing, held at his request, and "in the sunshine" at his request, calls into focus his reputation. Honesty or integrity. Sub judice, Petitioner asked for a public hearing which he received. He now complains that his honesty and integrity were placed in issue during that hearing. If his standing and associations in his community have been damaged, it is as a result of the public hearing which he himself requested, not because he has been denied a public hearing. Further, Petitioner requested from Director Gray a detailed written statement of reasons why he and the tenured faculty voted against granting tenure. Dr. Gray, in keeping with his understanding of the applicable law and University regulations then in effect, refused to provide such a written statement. Petitioner then filed his petition with the AFTC and it was only after being ordered to do so by that committee that Director Gray in a letter and a supplement thereto gave Petitioner written reasons why he had decided not to recommend that tenure be granted. Again, if public stigma has attached to Petitioner, it is only because of his insistence that the circumstances and matters involving the failure to renew his contract and refusal to grant him tenure be made public.
Petitioner first complains of no hearing and then of too much hearing. The latter was at his request. He may not have his cake and eat it too. If he has been deprived of liberty[10] such deprivation is of his own making and not that of Respondents.
Petitioner next claims that his termination was based upon unconstitutionally vague tenure criteria, in violation of his rights to due process. The criteria are set forth in the University of Florida Policy Manual (Section 5.52, PM 1, Section 3, Subsection C). No useful purpose will be served by quoting the provisions of that manual here. Suffice to say that our reading of the criteria reveals them to be neither vague nor overbroad. Indeed, the language of the printed criteria is more precise than the language employed by the courts when considering criteria in other cases, some of which cases are cited and relied upon by Petitioner.
In Rozman v. Elliott,[11] the following statement is found:
"Fitness for faculty status is not limited to performance in the classroom alone. It rests upon a broad range of factors ... including numerous personality and character traits." (335 F. Supp. at page 1096)
In Fluker v. Alabama State Board of Education[12] the court said:
"There are an enormous number of fact situations in which the nonreappointment of an employee may be justified by highly subjective and perhaps unforeseeable considerations." (441 F.2d at page 207)
And in McEnteggart v. Cataldo[13] the court held:
"We need not look beyond what was evidently the depositive reason, that McEnteggart was `difficult to get along with' and a `threat to the harmony' of the department.
......
"The department may well, as McEnteggart asserts, be purchasing harmony *211 at the expense of scholarly potential. Even so, the college can surely prefer harmony in deciding which of its non-tenured faculty members will be granted new contracts. The reason is not trivial or unrelated to working relationships within the college." (451 F.2d at page 1111)
We find the questioned criteria to be in keeping with constitutional requirements as to vagueness and overbreadth.
Petitioner next claims that he has been denied due process because the President of the University denied him review by an "area committee", denied Petitioner's request that the University compensate Petitioner's private counsel and because the President allegedly substituted his judgment for that of the AFTC hearing panel. Those contentions are without merit. Petitioner was afforded a lengthy hearing at which he was permitted to call witnesses and cross examine witnesses not called by him. He was entitled to a hearing which he received. He is not entitled to select a particular forum. There has been no showing that the AFTC hearing panel failed in any manner to afford Petitioner a fair and impartial hearing.[14] Our examination of the record reveals that the hearings before the AFTC hearing panel complied in every respect with the requirements of Goldberg v. Kelly[15] Woody v. Burns[16] and Due v. Florida A&M University[17]. Neither does the record reveal that the President of the University refused to accept the facts as found by the AFTC or that he substituted his judgment for that of the panel. On the contrary it is abundantly clear that the President accepted the findings of fact as announced by the panel but determined that he was not bound by the panel's conclusions and recommendations based on those facts. In so determining he did not err.
As to the payment of attorney's fees by the University, Petitioner does not claim that he was deprived of able representation[18] nor does he claim that he requested representation which was refused. He simply claims that he requested, and the University refused, payment to his private attorney, retained by him. This case is therefore clearly distinguishable from our decision in Perkins v. Florida State University,[19].
Petitioner's next allegation of denial of due process relates to the failure of the Regents to review the actions of the President of the University and Dr. Gray, the Department Director.
By statute the Regents are empowered to delegate to staff members and to heads of the several institutions and agencies under its jurisdiction such of its powers as it deems expedient and proper. (F.S. 240.042(1)) Pursuant to that authority the Regents adopted Rule 3.24A(2) which vests in the President of the University the final determination in matters of termination and recommendation for tenure of nontenured faculty members. Therefore, in accordance with that policy and authority, the Regents refused to review the failure to renew Petitioner's employment contract and the failure to grant tenure. In so doing the Regents did not deny Petitioner procedural due process, nor did they commit error. There is no vested right in any individual to require an administrative body to act in any particular manner nor by any particular body so long as the necessary minimal due process *212 standards are complied with. They were complied with sub judice[20].
Finally, Petitioner asserts that the delegation of authority by the Legislature to the Regents to establish procedures for hearing appeals pursuant to F.S. 240.042(2)(f) is an unconstitutional delegation of authority because it is not accompanied by specific guidelines or criteria.
In Hutchins v. Mayo[21] the court considered a case involving the Florida Citrus Commission which was created by statutory authority, the statutes vesting in the Commission the authority to grade and stamp citrus fruits by "promulgating and adopting rules and regulations." In holding the act valid, the Supreme Court of Florida said:
"It is true that these parts of the act place in the commission extensive plenary authority to regulate the grading and labeling of fruit to accomplish the general plan and purpose contemplated by the legislature but we find in them no unlawful delegation of power vested in the legislature by the organic law. Where a statute of this State empowering boards, bureaus or commissions to promulgate rules is in question `The test * * * is whether or not the act defines a pattern by which the rule or regulation must be made to conform.'
......
"The delegated powers in the instant case seem to be those which the Commission must necessarily exercise in order to effectuate the general scheme of the legislature to regulate the industry for the industry's sake and we find in the act no peculiarity which prevents placing it in the category of many similar ones where the legislature has empowered a board or commission to promulgate rules and regulations to bring to fruition plans which the law making body has conceived, created and circumscribed." (197 So. at pages 496-497)
In State Department of Citrus v. Griffin[22] the court said, considering the problem of delegation of authority:
"This Court has always been of the view that these tests must be tempered by due consideration for the practical context of the problem sought to be remedied, or the policy sought to be effected." (239 So.2d at page 580)
The Legislature has clearly stated its intent as to the policy sought to be effected in F.S. 240.001(2) and again in F.S. 240.042(1) to the effect that the Regents is to be a policy making body and may delegate such of its powers as are necessary to the presidents of the institutions for the management of the institutions. The Legislature specifically authorized the Regents to adopt rules and regulations relating to those matters which it would hear and to those matters which it would delegate. That authorization is in keeping with the expressed intent of the Legislature that the Board of Regents be a policy making body with the presidents of the several institutions exercising managerial functions.
We hold that the delegation by the Legislature to the Board of Regents under F.S. 240.042(2)(f) does not constitute an unconstitutional delegation of legislative functions in violation of Article II, Sec. 3 of the Constitution of the State of Florida.
We have carefully considered the other points and "subpoints" presented by Petitioner and find them too to be without merit.
The Petition for Writ of Certiorari be and it is denied.
It is so ordered.
JOHNSON and MILLS, JJ., concur.
NOTES
[1] Petitioner's contract of employment expired on June 30, 1973.
[2] 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)
[3] 408 U.S. 564, 92 S.Ct. 2701, 30 L.Ed.2d 181 (1972)
[4] 444 F.2d 128 (6th Cir.1971)
[5] 134 U.S.App.D.C. 81, 412 F.2d 1128 (1969)
[6] 415 F.2d 851 (5th Cir.1969)
[7] 432 F.2d 98 (5th Cir.1970)
[8] 430 F.2d 852 (5th Cir.1970)
[9] 430 F.2d 945 (5th Cir.1970)
[10] We find, and his own testimony reveals, that he has not.
[11] 335 F. Supp. 1086 (D.Neb. 1971)
[12] 441 F.2d 201 (5th Cir.1971)
[13] 451 F.2d 1109 (1st Cir.1971)
[14] Indeed, we note in Petitioner's brief that he himself refers to the committee proceedings as providing "Petitioner with a fair and impartial review."
[15] 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)
[16] 188 So.2d 56, Fla.App.1st 1966
[17] 233 F. Supp. 396
[18] On the contrary, the record reveals that he has been most ably represented throughout the proceedings leading to, and including the proceedings in this Court.
[19] Fla.App., 303 So.2d 415, opinion filed October 24, 1974.
[20] See Hargis v. Florida Real Estate Commission, 153 So.2d 836, Fla.App.2nd 1969; State ex rel. Davis v. Rose, 97 Fla. 710, 122 So. 225, Sup.Ct.Fla. 1929; Adams v. Board of Public Instruction of Okaloosa Co., 225 So.2d 423, Fla.App.1st 1969; Canney v. Board of Public Instruction of Alachua Co., 222 So.2d 803, Fla.App.1st 1969; and 42 Am.Jur., Public Administration Law, § 116.
[21] 143 Fla. 707, 197 So. 495, 1940
[22] 239 So.2d 577, Sup.Ct.Fla. 1970