Dr. Kenneth A. MEGILL, Plaintiff-Appellant,

v.

BOARD OF REGENTS OF the STATE OF FLORIDA et al., Defendants-Appellees.

No. 74-3273.

United States Court of Appeals, Fifth Circuit.

Nov. 1, 1976.
Rehearing Denied Dec. 1, 1976.

Benjamin R. Patterson, Tallahassee, Fla., Clyde Ellis, Columbus, Ohio, for plaintiff-appellant.

Thomas C. MacDonald, Jr., Tampa, Fla., for York, O'Connell and University of Fla.

Delbridge L. Gibbs, Jacksonville, Fla., for Bd. of Regents of St. of Fla.

James T. Schoenbrod, Counsel, Fla. Bd. of Ed., Tallahassee, Fla., for defendants-appellees.

Before WISDOM, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Plaintiff, a university professor, brought this civil rights action against the State Board of Regents for refusing to grant him tenure, alleging that in denying him tenure the defendants subjected him to a deprivation of his constitutional rights of free speech and due process. We affirm the district court's denial of relief to the professor on the ground that there was no violation of his federal rights.

Although this case was orally argued in November 1975, we postponed decision in the case to consider fully the Supreme Court's decision in *Bishop v. Wood,* —— U.S. ——, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). We have had the advantage of supplemental briefs addressed to the question of the effect of that decision on this case.

Dr. Kenneth A. Megill was hired as an assistant professor of philosophy by the University of Florida in 1966 on a yearly contract basis. In 1972 he was given notice by University President Stephen C. O'Connell that he would not be recommended for tenure. His contract could not be renewed beyond June 1973, since he had served the maximum number of years allowable without receiving tenure. Megill decided to take his case to the Board of Regents. Under Florida law, responsibility for granting tenure to university teachers is vested solely in the Board of Regents. Fla.Stat. § 240.042(2)(b) (1976 Supp.). Having before it the full transcript of five days of hearings before a hearing examiner appointed under the Florida Administrative Procedure Act, Chapter 120, Florida Statutes, the exhibits, briefs and other documents filed before the hearing examiner, and a comprehensive report of a three-member *ad hoc* committee of Board members, who heard oral argument of counsel for all parties, the Board of Regents decided not to grant tenure to Dr. Megill. Dr. Megill challenged this decision in federal court. The district court denied him redress.

 We note initially that review of this case has been made difficult because of the lack of preciseness with which it was presented to the district court and to this Court. This Court does not sit as a reviewing body of the correctness or incorrectness of the Board of Regents' decision in granting or withholding tenure. This is founded on the policy that federal courts should be loathe to intrude into internal school affairs. *Blunt v. Marion County School Bd.,* 515 F.2d 951, 956 (5th Cir. 1975); *Shanley v. Northeast Independent School Dist.,* 462 F.2d 960, 967 (5th Cir. 1972). The Supreme Court, in its recent decision of *Bishop v. Wood, supra,* held

[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. * * * In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

—— U.S. —— at ——, 96 S.Ct. at 2079–2080. The Court noted that states may grant or withhold tenure at their unfettered discretion. *Id.* at ——, 96 S.Ct. at 2080. As far as the federal court is concerned, the state could deny tenure to the plaintiff for no reason, a reason based on erroneous facts, or for any reason it chose, except for a reason that violated the plaintiff's constitutional rights. The federal court's only function in such a case is to decide the merits of plaintiff's constitutional claims. As this Court held in *Ferguson v. Thomas,* 430 F.2d 852, 857 (5th Cir. 1970), a teacher may neither be dismissed nor denied rehiring for constitutionally impermissible reasons, such as race, religion, or the assertion of constitutional rights. Similarly, the Supreme Court recognized in *Perry v. Sindermann,* 408 U.S. 593, 598, 95 S.Ct. 2513, 33 L.Ed.2d 570 (1972), nonrenewal of a nontenured schoolteacher's contract may not be predicated on his exercise of First and Fourteenth Amendment rights. Thus, even assuming that the Board arbitrarily denied tenure to plaintiff after he had "proven" his case for tenure, the teachings of *Bishop v. Wood* indicate that the federal courts would not have a place in the controversy absent a constitutional challenge. Although a nontenured teacher is entitled to due process consideration of First Amendment claims, the mere assertion of such a constitutional claim does not convert the federal procedure into a plenary administrative review. Whether the plaintiff

would have redress under Florida law in a state court is a question not before us.

The exact position of the Board in this controversy should be noted. The Board was not sitting as a reviewing authority over a contest between the plaintiff and the president of the university. The Board's job was to grant or deny tenure. All of its proceedings were an attempt to give the plaintiff a full opportunity to prove his case for tenure and to prove that to deny him tenure would violate his First Amendment right to free speech.

■ With respect to the requirement of a hearing and the adequacy thereof, in *Thaw v. Board of Public Instruction,* 432 F.2d 98, 99 (5th Cir. 1970), this Court stated that a school board is required to provide notice and hearing before dismissing a public schoolteacher or college professor in two types of cases. The first type is when a teacher has tenure or a reasonable expectation of reemployment. *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970). The second type is when a teacher without tenure or expectancy of reemployment asserts that he has been dismissed for constitutionally impermissible reasons. *Pred v. Board of Public Instruction,* 415 F.2d 851, 856 (5th Cir. 1969). This case falls into the second category.

■■ The University of Florida has an explicit written tenure program which incorporates a probationary period. Without being granted tenure, plaintiff had no right to reemployment, either under the terms of his contract, the rules and policies of the University of Florida, or the laws of the State of Florida. For a discussion of the tenure system of the University of Florida, see *Cornwell v. University of Florida,* 307 So.2d 203 (1st D.C.A.Fla.1975). Furthermore, although this Court has recognized that an untenured teacher may acquire a reasonable expectation of continued employment, *see, e. g., Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970); *Lucas v. Chapman,* 430 F.2d 945 (5th Cir. 1970), we find that these cases are factually distinguishable based on the different practices of the schools. In *Ferguson,* a professor faced ter-mination of his employment at a college where he had taught for nine years. The college had no tenure system but its rules provided that a teacher could only be dismissed "for cause." These practices were sufficient to create in Dr. Ferguson an expectancy of reemployment. In *Lucas,* the teacher had been employed for nearly twelve years by the school system. Because of his long employment, this Court found a legitimate expectancy of reemployment. It is not necessary to consider whether *Lucas* has survived *Perry v. Sindermann,* 408 U.S. 593, 95 S.Ct. 2513, 33 L.Ed.2d 570 (1972). In the instant case, because of the explicit written tenure program, Dr. Megill has failed to prove that he had a reasonable expectancy of continued employment. *See Cornwell v. University of Florida, supra,* 307 So.2d at 209. Thus, because Dr. Megill had no form of tenure or right to continued employment beyond the term of his contract nor a reasonable expectation of reemployment, he did not have the requisite "property" interest in being rehired upon which to base a claim to constitutional due process. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 95 S.Ct. 2513, 33 L.Ed.2d 570 (1972).

■ Dr. Megill, however, has alleged that he was dismissed for constitutionally impermissible reasons. After adequate notice, a hearing was conducted that lasted five days. The transcript of this hearing occupies over 1700 pages. Although length alone is not indicative of the adequacy of a hearing, the notice and hearings accorded the plaintiff were clearly sufficient. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ Again, we emphasize that our proper function in this case is to examine Dr. Megill's constitutional challenges. As a nontenured employee, he had the burden of proof. *Fluker v. Alabama State Board of Educ.,* 441 F.2d 201, 205 (5th Cir. 1971). In light of these general principles, we examine each of the four specific issues raised by plaintiff on this appeal, even though some arguments may seem inappropriate in light

of the federal function in this case: *first,* denial of due process because certain Board members failed to recuse themselves for prejudice; *second,* denial of due process because the Board as a whole gave inadequate consideration to his case; *third,* clearly erroneous findings of essential facts by the district court; and *fourth,* tenure was denied and employment was terminated for constitutionally impermissible reasons.

## RECUSAL OF BOARD MEMBERS

At a 1972 meeting of the Board of Regents, Dr. Megill delivered a statement on behalf of the American Federation of Teachers, Local 1880, of which he was president. At that meeting he objected to a proposal for annual evaluation of the university faculty. He stated that the proposal was developed by the Council of Presidents and without consultation with the faculty members who would be affected. President O'Connell, one of the defendants in this case and former president of the University of Florida, challenged the truthfulness of this statement. Megill asserts that all Board members but one were present that day. Because this very incident was one of six reasons on which the Board relied to support denial of tenure, Megill claims the Board was not impartial, and therefore, all but one of the members should have recused themselves.

▆▆▆ An impartial decisionmaker is a basic constituent of minimum due process. *Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir. 1970); *Simard v. Board of Educ.,* 473 F.2d 988, 993 (2d Cir. 1973). In *Duke v. North Texas State Univ.,* 469 F.2d 829 (5th Cir. 1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), this Court refused to adopt any *per se* rule disqualifying administrative hearing bodies. The record must support actual partiality of the body or its individual members. "In the absence of evidence to the contrary, we must assume therefore that the [administrative hearing body] acted independently and properly in these circumstances." 469 F.2d at 834. *Accord Jenkins v. Louisiana*

*State Bd. of Educ.,* 506 F.2d 992, 1003 (5th Cir. 1975).

▆▆▆ Megill deposed seven Board members. None were shown to have been biased by Megill's prior appearance before the Board. All reported they had not become familiar with the case until it was before the Board for review of nontenure. There was no evidence to the contrary. A study of this record does not disclose the actual bias needed for disqualification. *Cf. Woodbury v. McKinnon,* 447 F.2d 839, 844–845 (5th Cir. 1971).

In *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n,* —— U.S. ——, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the Supreme Court recently gave great weight to the significant governmental interest in having matters decided by a school board legally authorized to be the decisionmaker. It held that where the Board members had no disqualifying personal or official bias, mere familiarity with the facts of the case gained by them in the performance of their statutory role did not disqualify them as decisionmakers.

In *Simard v. Board of Educ.,* 473 F.2d 988 (2d Cir. 1973), the teacher, as chief negotiator for the local teacher association, bargained for new contracts before the very Board that denied his contract renewal. Although the negotiations were characterized by particular bitterness and recrimination, the Board was not denied the right to perform its proper function of reviewing the teacher's action for contract renewal. 473 F.2d at 992–993. The Court noted that to hold otherwise would require that decisions as to teacher competence be surrendered to a body less familiar with relevant considerations and not responsible under state and local law for making those decisions. Thus, absent a showing of actual, rather than potential, bias, due process did not required a different conclusion. *Id.* at 993.

In view of the Board's position as a decisionmaker, and not as an adjudicator between contesting parties, Megill's claim of the Board's partiality is without merit.

## ADEQUACY OF CONSIDERATION
## BY THE BOARD

Megill argues that he was denied due process in that the Board of Regents gave inadequate consideration to his case. The Board assigned to a three-member *ad hoc* committee the task of reviewing the hearing examiner's record and preparing a recommended report for consideration by the full Board. The recommended report was adopted by the entire Board, except for minor grammatical changes.

Again the issue has been presented to this Court as if the Board was serving in a quasi-judicial function rather than as an administrative decisionmaker. But we address the argument as a veneer on our concept of the Board's function insofar as it is directed to the Board's consideration of Megill's First Amendment claims.

 Due process requires that administrative board members exercise their independent judgment in arriving at a decision. *Lee v. Macon County Bd. of Educ.,* 490 F.2d 458, 460 (5th Cir. 1974). There is no requirement, as petitioner contends, that each Board member individually inspect every line of the record as compiled by the Board and the hearing examiner. *See Morgan v. United States,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938); *Morgan v. United States,* 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); 2 K. Davis, *Administrative Law Treatise* § 11.03, at 45–46 (1958). Neither is there a prohibition against delegating to some board members the responsibility of reviewing the record. *Morgan v. United States, supra,* 298 U.S. at 481, 56 S.Ct. 906.

 At the state level this case was controlled by the Florida Administrative Procedure Act then in force. *See* Fla.Stat. § 120.011 *et seq.* (1973). *Board of Regents v. Budjan,* 242 So.2d 163 (1st D.C.A.Fla. 1970). We cite only to the statutes in effect at the time of the Board's action, although many of them have since been repealed, amended or renumbered. Inadequate consideration is not implied through the use of the *ad hoc* committee. Florida law allows this type of delegation. Fla. Stat. § 120.24(1) (1973). The Board of Regents is specifically empowered by statute "to delegate to its staff and to heads of the several institutions and agencies under its jurisdiction such of its powers as it deems expedient and proper." Fla.Stat. § 240.-042(1) (1976 Supp.). Under administrative procedures, the Board was not bound in any way by the result reached by the hearing examiner. *See* Fla.Stat. §§ 120.25(8), 120.-28 (1973). Here the Board arrived at a somewhat contrary result.

The *ad hoc* committee heard oral arguments and received written briefs from counsel before making its recommendation. All three members concurred in the report. The chief draftsman of the report conducted a full study of the hearing examiner's record. That report was circulated to the full Board. It was adopted at the Board's regular meeting about three weeks later. The report itself is a detailed treatment of Megill's case and evidences substantial consideration of his claims. On this record, Megill's argument that his case was given legally inadequate consideration must be rejected.

## DISTRICT COURT'S FINDINGS OF
## FACT AND DENIAL OF TENURE
## FOR CONSTITUTIONALLY IMPER-
## MISSIBLE REASONS

Megill argues that the district court was clearly erroneous in its findings of essential facts. He also argues that even if the district court was not clearly erroneous in its findings, this Court should undertake to review all of the alleged reasons for the Board's activity to see if any were constitutionally impermissible.

 As a factual matter he points out that President O'Connell based his recommendation of nontenure on the cumulative effect of seven instances of misconduct. This framework, it is argued, formed the basis for review by both the hearing examiner and the Board. President O'Connell gave seven reasons for recommending that Megill not be given tenure. The hearing examiner only found evidence to support

two of these reasons. Holding the remaining five either not supported by the evidence or constitutionally protected, he then stated that "I cannot recommend that the Board of Regents deny Dr. Megill his promotion and tenure, notwithstanding the President's decision not to recommend him for the same." The Board of Regents, acting independently, not bound by the hearing examiner's findings, reconsidered all of the evidence taken by him and denied tenure on six of the asserted grounds, none of which it considered to be constitutionally protected. The district court found sufficient evidence to support the two grounds found reliable by the hearing examiner, and further found that these alone were adequate to deny Dr. Megill's tenure and did not involve constitutionally protected activity. The court, however, did not review the other four reasons relied upon by the Board. The district court relied on *Toups v. Authement*, 496 F.2d 700 (5th Cir. 1974), in limiting its review to the "question of whether or not there was substantial evidence to support the decision of the Board of Regents." Consequently, the court determined that it must affirm the Board's decision if any one reason was supported by substantial evidence and not constitutionally protected. *Toups*, however, involved a tenured teacher with a "property" interest in continued employment, who was entitled to substantive, as well as procedural, due process before she was dismissed. That standard does not control the present case where the issue is not whether the Board had sufficient reason to deny tenure to Megill, but whether in denying him tenure it violated his First Amendment rights. The district court erred in limiting its review to only the two grounds relied on by the hearing examiner. *First,* it is the Board's decision, not the hearing examiner's, which must be considered in federal court.

 *Second,* there is law to the effect that when a person is fired partially because of constitutionally protected reasons, the entire action is defective. *See Fluker v. Alabama State Bd. of Educ.*, 441 F.2d 201 (5th Cir. 1971). The Court in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970), recog-

nized the need to review a college instructor's substantive constitutional claims, such as his First Amendment rights, in his suit against college officials who had allegedly terminated his employment for unconstitutional reasons. *See Duke v. North Texas State Univ., supra,* 469 F.2d at 837, *citing, Board of Regents v. Roth,* 408 U.S. 564, 582, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (Douglas, J., dissenting). In the instant case, five of the six reasons relied on by the Board involved some form of speech. The district court should have examined all of the grounds for the Board's action and balanced the right of a teacher to speak against the right of the Board to manage the effective functioning of the state's educational system. *See, e. g., Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968); *Duke v. North Texas State Univ., supra,* 469 F.2d at 838; *Moore v. Winfield City Bd. of Educ.,* 452 F.2d 726, 728 (5th Cir. 1971); *Ferguson v. Thomas, supra,* 430 F.2d at 859; *Lusk v. Estes,* 361 F.Supp. 653, 660 (N.D.Tex.1973). As Judge Clark stated in *Ferguson, supra,*

> [t]he college had no right to control [the instructor's] speech or to curtail his freedom of association, but they did have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor.

430 F.2d 859. *See Abbott v. Thetford,* 529 F.2d 695, 699 (5th Cir. 1976); *cf. Smith v. United States,* 502 F.2d 512 (5th Cir. 1974).

*Third,* we find the district court erred in limiting its review to only two of the six grounds for denial of tenure because it does not appear from the record that either the President of the University or the Board of Regents would necessarily have denied tenure on these two grounds alone.

 Because of the error in the district court's approach, this appeal poses the problem of whether the case should be remanded to the district court, or should be reviewed by us to determine if any of the Board's reasons violated Megill's right to free speech. All the evidence before the

district court is now before this panel on appeal. The record is complete. Argument has addressed each reason. The determination is essentially legal and not factual. Both parties agreed on oral argument that this Court had the power to review the record under these circumstances. Both the interests of the parties and the exigencies of judicial economy mandate such a review by us. Dr. Megill's case has been pending in the federal courts since 1973. Further delay in remanding the case to the district court would serve the interests of neither party. We have, therefore, fully reviewed the record to determine if any of the Board's reasons for denial of tenure violated Dr. Megill's right to free speech. Such taint of any one reason would require a remand to the district court.

Having carefully reviewed the record, we find that none of the speech-related activity of Dr. Megill was constitutionally protected. A condensed recitation of each reason given by the Board is needed to illustrate this conclusion.

### 1. *Philosophy 365*

■ The Board found that Dr. Megill had violated the course catalog in his teaching of Philosophy 365. Without obtaining the requisite approval, Megill, along with another professor, combined this philosophy course with Political Science 465. The courses were identical, although the latter was under the control of the political science department and designed for political science majors. The result of this combination was that any student could register for both courses and receive credit hours for both while doing the work of only one course. The Board found that the courses lacked adequate supervision by Megill and that there was no effective way to evaluate a student's work in either course. The Board determined that such course·study was made a mockery by having all but eight of the 257 students receive A's or B's. Dr. Megill's constitutional rights of "freedom of speech, association, assembly, and academic freedom" were in no way infringed, as alleged, by the Board's reliance on the reason for its denial of tenure. It is essential that an academic board review a teacher's classroom activities in determining whether to grant or deny tenure. This review does not contravene the teacher's academic freedom.

### 2. *Jacksonville Incident*

[20] On March 10, 1969, Megill accompanied President O'Connell, the Chancellor of the state university system, and others to Jacksonville for a meeting with legislative leaders. At·the meeting, President O'Connell defended Dr. Megill's right to make certain controversial statements previously attributed to him. Immediately after the meeting, Megill called a press conference and made the following statement.

The support of members of the department where I work, of the students with whom I am associated, of the black militants whom I am happy to call my friends and many citizens who have defended my right to speak and teach has made it possible for me to remain at the University of Florida.

Yet the events of the past week have shown that bayonets speak louder than the words of any professor, just as the events of the past month have confirmed the long history of political meddling in the public universities of Florida.

Those who feel relieved now that President O'Connell has decided that I may remain at the University of Florida should realize that our university is still an authoritarian institution in which the faculty and students are powerless when facing the decisions of a politically appointed president. Police violence and political meddling are still facts of life for the public universities of Florida.

The Board, although recognizing plaintiff's right to make such statements, found them to be untrue and likely to cause divisional strife within the university campus and between the school and the state's political leadership. Whether Megill's statement related to an incident at another Florida university is not clear. The hearing examiner had recognized the lack of clarity in Dr. Megill's statement and that it gave

the impression that the University of Florida was the intended subject of the remark. None of these events had occurred at the University of Florida. Moreover, Megill's statement makes reference to the authoritarian rule of President O'Connell. It was O'Connell, however, who had just defended Megill's right to free speech and academic freedom. The Board found such remarks evidenced Megill's tendency to make untrue and misleading public statements. It was this and not the fact that Dr. Megill made public statements that guided the Board.

### 3. *The Marshall Jones Case*

[21] Marshall Jones was a former member of the University of Florida faculty who had been denied tenure. He had apparently alleged that this action denied him his academic freedom. There was criticism from the American Association of University Professors and the American Federation of Teachers over the denial of Jones' tenure. In an interview with the student newspaper, Megill made the following statement in reference to the Jones case:

But that man [President O'Connell] is dangerous.

He's under no control from the people who live and work at this university—absolute power. And he uses it arbitrarily . . . as he did in my case, as he did with *Jones,* as he did with Canney. (emphasis added).

The fact is that the denial of tenure to Jones occurred during the time of O'Connell's predecessor in office. According to the Board, "[t]he facts in this case could have been known to Megill had he undertaken any study before publicizing a factually false attack on the President." The hearing examiner had found that O'Connell wielded no arbitrary power in the Jones case. In fact, O'Connell stated he would reopen the case if directed to do so by a court or the Board of Regents to do whatever he could in a matter completed before his coming into office. He also indicated a willingness to reopen the matter if the University Senate Committee on Academic Freedom and Tenure found either funda-

mental error with the proceedings or a violation of Jones' academic freedom. O'Connell was never so advised.

The Board recognized Megill's freedom to express his opinion. What the Board relied on, however, was the falsity of the statement and petitioner's failure to investigate his facts before making the comment, a task thought to be relatively easy. From the record it becomes evident that Megill's remarks were without foundation in fact. In relying on this incident as one basis for denial of tenure, the Board looked to the inaccuracy of the statement, unprotected by the First Amendment in this context. The record supports the Board's position.

### 4. *The Yale Club Incident*

On May 30, 1969, the Yale Club held a meeting, attended by about fifty people, at one of the local hotels in Gainesville. The program for the meeting was to be a panel discussion on student dissent. The panel consisted of a professor of religion, a professor of law, a professor of medicine and the then Chancellor of the state university system. At the conclusion of one of the speaker's remarks, Dr. Megill, from the audience, stood up and began speaking. His remarks were characterized by Chancellor Mautz, one of the panel members, as "almost rantings . . . [and], in my view, not responsive to the presentation just completed." Megill made frequent use of an offensive slang word in his remarks. The presiding panel member regained control of the meeting and the speeches proceeded.

Following the prepared remarks of Chancellor Mautz, however, Megill again stood up and addressed the meeting. Again Megill used profane terms. As a result of Dr. Megill's conduct, the meeting was completely disrupted and was adjourned before its natural completion. The hearing examiner found none of the facts of this incident to be in dispute. This incident was one of the two grounds that the district court relied on in finding that the denial of tenure was proper. The court found no constitutionally protected rights here.

Megill attempted to justify his actions by stating that his remarks suited what he thought to be the quality of the speeches at an event that was "totally social in nature and not at all of an academic character." Both the Board and the hearing examiner found this meeting to be academic in nature.

The Board determined Dr. Megill's conduct and profanity lacked the maturity and discretion of a qualified member of the academic community and concluded that his disruption of the meeting in such an anti-intellectual manner impeded his usefulness as a teacher. The record fully supports the nature of Megill's conduct at this meeting and the disruptive effect it had. This conduct can appropriately be used by the Board to evaluate the competence of a teacher without violating any First Amendment right.

### 5. *The Biggs Incident*

■ This incident involved Megill's actions at an open meeting taking place on the University of Florida campus in May 1970, during the aftermath of the Kent State shootings. The meeting was open to the public and attended by students, faculty and staff from the university. Thomas Biggs, attorney for the university, and another member of the university staff attended the meeting. When they entered the hall where the meeting was being held, Megill announced to the crowd that the administrative spies had arrived. He also indicated to the gathering that Biggs was one of the people opposing Megill in a litigational matter then before the federal district court in Orlando. That case involved the constitutionality of the state's loyalty oath. Biggs left the meeting shortly thereafter.

The Board found Megill's statements to be untrue. Biggs was a member of the university community and certainly entitled to attend an open meeting. The reference to Biggs's opposition in the loyalty oath case was incorrect. In fact, Biggs did not actually oppose Megill. Representing the interests of the university and President

O'Connell, Biggs merely sought a speedy judicial determination of the oath's legality. In his testimony before the hearing examiner, Megill himself admitted that, upon reflection, "his characterization might be incorrect." The district court, agreeing with the hearing examiner, found substantial evidence to support the statements' inaccuracy and determined them not to be constitutionally protected. The record supports that decision.

### 6. *The Appearance Before the Board of Regents*

■ Dr. Megill appeared before the Board of Regents meeting on March 7, 1972. He was there as president of the local A.F.T. chapter which opposed a proposition that would compel annual evaluation of tenured faculty members. In the course of his prepared remarks, Megill made the following assertion:

> The Florida Universities American Federation of Teachers, Local 1880 objects strongly to the arbitrary manner in which this proposal has been approved by the Council of Presidents with no consultation with the faculty members who will be affected by the abolition of tenure.

President O'Connell also appeared before the Board that day, but refuted the accuracy of Megill's statement. Dr. Megill was later to explain his remark by saying that he meant "consultation" in the sense of union semantics.

The Board found that the statement regarding the lack of consultation was "patently false." Evidence was presented that there had been consultation with faculty members. At the University of Florida campus, the proposal had been reviewed by the University Senate Steering Committee. The University Senate had the largest faculty representation of all the campus organizations. In addition, the proposal was reviewed by the Academic Freedom and Tenure Committee and the Chairman of the Professional Relations and Standards Committee. Also the presidents of the local A.A.U.P. and U.P.A.O. reviewed the proposal.

It is apparent that Dr. Megill's statement, in any context, was divorced from the true facts of the situation. Again the Board looked to Megill's inability to make accurate public statements concerning university affairs rather than the fact that he made public statements. Such action does not constitute First Amendment violation.

## SUMMARY

The above six incidents served as the basis for the Board's decision. Throughout its written opinion, the Board was particularly sensitive to Dr. Megill's right to free speech as guaranteed by the First Amendment. In each instance, however, the Board had found either that Megill made false and inaccurate statements to the public or that his conduct demonstrated a lack of professional maturity. The Board believed these events demonstrated a lack of character and intellectual responsibility needed for a tenured professor.

Any balancing of Dr. Megill's First Amendment interests against those of the Board of Regents must weigh in favor of the Board. On each occasion when Dr. Megill made public remarks, the Board found that he made statements he either knew to be false, or that he could have easily investigated for accuracy. The Board thought his actions reflected a lack of the attributes of professionalism and maturity needed for a tenured member of the academic community. The Board of Regents maintains a strong interest in retaining only those professors possessing the qualities of character that accentuate the high standards of the teaching profession. The First Amendment protects the right to make a statement. It does not, however, clothe a person with immunity when his statements are shown to be false and inaccurate, when their truth could be easily ascertained. First Amendment rights must always be viewed "in light of the special characteristics of the school environment." *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Out of necessity, an academic board, in deciding whether or not to grant tenure, must consider an instructor's communications both in the classroom and outside. This review may often come in contact with free speech areas. Conflicting interests must be balanced. Employer-employee relationships are highly subjective. *Fluker v. Alabama State Bd. of Educ.,* 441 F.2d 201, 207 (5th Cir. 1971). Taking all of these considerations into account and balancing the asserted interests of both Dr. Megill and the Board, we find that the Board's interests outweigh those of Dr. Megill. Accordingly, we hold that none of the above-mentioned incidents relied on by the Board were constitutionally protected.

Furthermore, there is nothing in the record to indicate that the Board was motivated in any way by a desire to deprive plaintiff of his constitutional rights. *See Bishop v. Wood, supra,* —— U.S. ——, 96 S.Ct. 2080. In *Fluker v. Alabama State Bd. of Educ., supra,* 441 F.2d at 209, this Court stated that when a violation of constitutional rights has been charged, "to the extent that the absence of factual support for the stated reasons for the University's action tend to prove that some other constitutionally impermissible reason underlies the action, the courts should examine the credibility of the University's stated reasons." Without deciding the merits of the reasons given by the Board for its action, we have reviewed them to determine that they are sufficiently supported factually to guide the Board, and were genuinely relied upon by the Board, without pretext. Such a determination lends credibility to the Board's action and negates the inference that constitutionally impermissible reasons motivated its decision not to grant tenure.

Throughout our review of the record, we were always cognizant of the important free speech considerations inherent in the safeguarding of academic freedom. *See Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). But Dr. Megill's case does not in any way threaten the preservation of academic freedom. At all levels of the administrative determination, his constitutional rights

**1086**

were recognized. When his statements and actions fell short of those that the Board could rightfully expect of its tenured professors, the state's strong interest in a quality university system and effective teacher contribution to the educational process prevailed. *See Pickering v. Board of Educ.,* *supra,* 291 U.S. at 569, 88 S.Ct. 1496, 20 L.Ed.2d 562; *Moore v. Winfield City Bd. of Educ., supra,* 452 F.2d at 728.

AFFIRMED.