Robert J. **MAYBERRY**, Appellee,

v.

William **DEES**, Chairman, Board of Governors, University of North Carolina, individually and in his official capacity, William Friday, President, University of North Carolina, individually and in his official capacity; Robert Morgan, Chairman, Board of Trustees, East Carolina University, individually and in his official capacity; Leo W. Jenkins, Chancellor, East Carolina University, individually and in his official capacity; Robert L. Holt, Vice-Chancellor, East Carolina University, individually and in his official capacity; Robert W. Williams, Provost, East Carolina University, individually and in his official capacity; Richard Capwell, Dean Arts and Sciences East Carolina University, individually and in his official capacity; Joseph Fernandez, Chairman of Romance Languages, East Carolina University, individually and in his official capacity, Appellants.

National Education Association, Amicus Curiae.

Robert J. **MAYBERRY**, Appellant,

v.

William **DEES**, Chairman, Board of Governors, University of North Carolina, individually and in his official capacity; William Friday, President, University of North Carolina, individually and in his official capacity; Robert Morgan, Chairman, Board of Trustees, East Carolina University, individually and in his official capacity; Leo W. Jenkins, Chan-

cellor, East Carolina University, individually and in his official capacity; Robert L. Holt, Vice-Chancellor, East Carolina University, individually and in his official capacity; Robert W. Williams, Provost, East Carolina University, individually and in his official capacity; Richard Capwell, Dean, Arts and Sciences, East Carolina University, individually and in his official capacity; Joseph Fernandez, Chairman of Romance Languages, East Carolina University, individually and in his official capacity, Appellees.

National Education Association,
Amicus Curiae.

Nos. 79–1204, 79–1205.

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1981.
Decided Nov. 5, 1981.

**504**

Jim D. Cooley, Winston-Salem, N. C. (William G. Pfefferkorn, Pfefferkorn & Cooley, P. A., Winston-Salem, N. C., on brief) for appellants.

Julia Penny Clark, Washington, D. C. (Michael H. Gottesman, David M. Silberman, Bredhoff, Gottesman, Cohen & Weinberg, David Rubin, Nat. Ed. Ass'n, Washington, D. C., on brief) for amicus curiae.

Marvin Schiller, Asst. Atty. Gen., Edwin M. Speas, Jr., Sp. Deputy Atty. Gen., Raleigh, N. C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N. C., on brief) for appellees.

Before HAYNSWORTH, Senior Circuit Judge, HALL and MURNAGHAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

## I.

### The Factual Setting

A. *The parties and prior developments.*

East Carolina University (the University) is a constituent institution of the University of North Carolina, and, as such, is a state agency. *MacDonald v. University of North Carolina at Chapel Hill*, 299 N.C. 457, 263 S.E.2d 578 (1980). The University employed Robert J. Mayberry, the holder of a Ph.D. degree,[1] as an assistant professor of romance languages[2] commencing in the fall of 1967. His was a probationary status, the initial appointment being for a period of one year,[3] with successive automatic renewals for one year in the absence of notice of termination given no less than one full academic year prior to the commencement of any school year.[4]

As was the customary approach in the case of full time academic faculty members at the University, it was expected that, during the fifth year in probationary status, i. e., during 1971–72, Mayberry would be considered for tenure. If tenure were granted, Mayberry would achieve essentially permanent status, to last until retirement unless interrupted by his death, incapacity or resignation. If tenure should not be conferred following consideration in the fifth year, upon expiration of the sixth year, allowed in compliance with the one-year notice provision, his employment by the University would be without possibility of renewal or extension and would inevitably terminate.[5]

During the fifth year, tenure was not granted to Mayberry.[6] On September 13, 1973, he sued, pursuant to 42 U.S.C. § 1983, claiming that the denial of tenure was retaliatory, to punish him for exercise of protected rights of free expression guaranteed to him by the First Amendment.[7] The defendants included an academic, administrators and governors or trustees.

---

1. Received in 1968, after his initial employment by the University had begun.

2. During his six years at the University, Mayberry taught Spanish. His doctoral thesis was on a subject of French medieval literature. The question of his qualifications to teach French plays no role in resolution of the issues which confront us.

3. The academic year, that is, of nine months of service, payable in twelve installments.

4. For the first two years, shorter periods of time were allowed for the notice of termination (by March 1, 1968 the first year, and by December 15, 1968 the second year).

5. In the district court, it was contended that Mayberry had tenured status, because of his appointment for the sixth year, but a partial summary judgment was entered that there was no automatic conferral of tenure where Mayberry had specifically been denied tenure before expiration of his probationary period. That decision was evidently correct and the claim does not appear to have been pursued on appeal.

6. By letter of April 20, 1972, the University president informed Mayberry that he would not be granted tenure, nor employed beyond the 1972–73 academic year.

7. The complaint also raised due process and equal protection claims, but they are not pursued in the appeal. *See Clark v. Whiting*, 607 F.2d 634 (4th Cir. 1979).

We have held in a prior opinion, *Mayberry v. Dees*, 638 F.2d 690 (4th Cir. 1981),[8] reheard, and now reconsidered, by a reconstituted panel, that no defendant, save Dr. Joseph F. Fernandez, was liable, officially or individually, because of Eleventh Amendment immunity, on the one hand, and because of the defense of good faith immunity, on the other.[9] For the additional considerations which we here elaborate, we approve those holdings of non-liability.[10] Moreover, we have decided that the judgment in favor of Mayberry, against Fernandez, should be reversed, the claim of retaliation as punishment for First Amendment exercise not having been established. The reasons applicable to the case of Fernandez apply *a fortiori* to all other defendants. In view of those conclusions, there is no basis for granting reinstatement. The district court had denied relief of that nature, and we now affirm that aspect of the decision.

### B. *The operative facts.*

#### 1. *Mayberry's tenure prospects before exercise by him of the protected speech.*

The actual course of Mayberry's career at the University, insofar as the record discloses, progressed, if not altogether without incident, still essentially quietly until sometime in the fall or winter of the 1971–72 academic year (the fifth year of employment, and, consequently, the year in which Mayberry was to be considered for tenure).

8. The opinion, having been withdrawn because of the grant of rehearing, appears only in the advance sheets, not in the final published volume.

9. We did conclude that Mayberry was entitled to reinstatement.

10. Furthermore, the plaintiff has dismissed the claims made against the following defendants in their individual capacities: William Dees, Chairman of the Board of Governors, University of North Carolina, William Friday, President, University of North Carolina, and Robert Morgan, Chairman, Board of Trustees, East Carolina University.

11. *Contrast Selzer v. Fleisher*, 629 F.2d 809, 810 (2d Cir. 1980); *appeal pending* ("Selzer had been enthusiastically recommended by the appropriate committees in the political science department and the School of Social Science

Nevertheless, the record compiled by Mayberry anterior to the asserted violation of his First Amendment rights did not justify a conclusion that, with a large measure of probability (let alone certainty), he would, during the critical fifth year, be recommended for tenure.[11] It was during that fifth year, 1971–72, that the utterances for which Mayberry has claimed First Amendment protection against retaliation were made.

As early as July 16, 1970, well before there existed any basis for claiming retaliation as punishment for free speech exercise, Fernandez, the chairman of the romance languages department, in the Annual Evaluation for Mayberry, prepared as part of the regular practice,[12] expressed "doubts about tenure", pointing out that he "[c]ontinues to conduct classes in English" "and refuses to follow" "my views concerning use of the language [Spanish] in class," being "so opposed to *my* objectives for the Department." He further observed that Mayberry was "given to complaining" and "not willing to compromise." There was evidence, independent of the Annual Evaluations, that Mayberry insisted that it should be done Mayberry's way, not the Department's way, insofar as instruction through the medium of English rather than Spanish was concerned.[13]

Another faculty member's 1970 Annual Evaluation stated:

for promotion from Assistant to Associate Professor in the Spring of 1976.").

12. The Annual Evaluations were admitted in evidence, not for their truth, but as indications of Fernandez' motive. That motive is what the case is all about, and, in referring to the contents of the Annual Evaluations, we observe the same restrictions with respect to them as obtained at trial.

13. At some time before March 26, 1970, there had surfaced a basic professional difference of opinion between Mayberry and Fernandez over whether upper level romance language courses should be conducted in the language of instruction (here Spanish), a common university practice. Mayberry, although apparently making concessions to the necessities of the situation, still as late as June 1972 was continuing to insist that his "refusal to teach literature

I suspect that if there is a conflict between departmental program and personal desires, however, he will opt for personal desires. He is adolescent in his insistence on "my personal freedom...." He is, however, lazy.

That academic evaluator concluded that he would recommend tenure only as a means of keeping the services of *Mrs.* Mayberry for the department.

The November 1971 Annual Evaluations are mixed.[14] One stated:

[D]oes not give impression that he works very enthusiastically or derives great satisfaction from teaching.... Potential probably limited, especially until he gains greater conviction concerning teaching profession.... He lacks a kind of strength that would make me recommend him for tenure with confidence that I was getting the best man possible for the position.

There were also evaluations in November, 1971, that recommended tenure for Mayberry.

courses in the language" fell within his academic freedom rights. Anyone contemplating tenure for Mayberry would hardly fail to anticipate that, with the resulting permanence of employment, and consequent independence, attendant upon a grant of tenure, he would go his own way, in contradiction of department policy. *Cf. Hetrick v. Martin*, 480 F.2d 705, 709 (6th Cir. 1973), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973) ("We do not accept plaintiff's assertion that the school administration abridged her First Amendment rights when it refused to rehire her because it considered her teaching philosophy to be incompatible with the pedagogical aims of the University. Whatever may be the ultimate scope of the amorphous 'academic freedom' guaranteed to our Nation's teachers and students, ... it does not encompass the right of a nontenured teacher to have her teaching style insulated from review by her superiors when they determine whether she has merited tenured status just because her methods and philosophy are considered acceptable somewhere within the teaching profession.").

It is only a by-the-way, but contrast Grant Gilmore, *The Good Faith Purchase Idea and the Uniform Commercial Code: Confessions of a Repentent Draftsman*, 15 Ga.L.Rev. 605 (1981):
When I reported for duty in New Haven, Dean Wesley Sturges said to me: "You will teach Sales." I said: "Yes, sir." That is

Fernandez, in a May 26, 1971 Evaluation, unquestionably before the fall and winter 1971 utterances for which First Amendment protection is claimed, noted that Mayberry "now says he agrees with my objectives," and concluded: "If reduction in staff is forced upon us, would hesitate to give him tenure. Otherwise, would not object."

Under the administrative procedures of the University, Fernandez, as chairman of the department of romance languages, was delegated the responsibility, after such consultation with other faculty members of the department, and the dean, as he deemed appropriate or possible, of forming, and forwarding, through the dean, to the University provost, a recommendation as to whether tenure should, or should not be granted.[15] Responsibility for the final decision reposed in the chancellor, but, as a practical matter, it was unlikely that tenure would be granted in the face of a negative recommendation from the department chairman. *Cf. Clark v. Whiting*, 607 F.2d 634, 637 (4th Cir. 1979).

how I became a commercial lawyer. I do not know how such matters are handled today.

**14.** Plaintiff only proved that he commenced the free speech exercise on which his case depends some time in the fall of 1971–72, shortly after October 19, 1971. It is a small point, the Annual Evaluation comments critical of Mayberry being only cumulative, and the praiseworthy statements being well before the April 1972 decision as to tenure in any event. Still, it was Mayberry's burden, as plaintiff, to prove dates to the extent they would or might be relevant or decisive.

**15.** The University Faculty Manual stated: "The decision regarding retention of a non-tenured faculty member will be made by the Department Chairman after such consultation with members of the faculty and the Dean of the College or School as he shall deem appropriate in each case."

While others on the romance language department faculty were divided as to whether they should recommend Mayberry for tenure, their views have a very diminished consequence for our purposes (except as they show that negative impressions of Mayberry were not solely confined to Fernandez). At the University, the department chairmen principally called the shots, and it was thus what Fernandez would recommend that counted.

## 2. Circumstances leading up to Mayberry's exercise of free speech and free press.

In the fall of 1971, the University was looking ahead to an upcoming decennial reaccreditation, a matter of considerable importance to an educational institution. Loss of accreditation would call into question the capability of the University to perform creditably its educational mission. Lacking accreditation, it would find its ability to attract competent teachers and qualified students substantially diminished.

The University established a Self Study Steering Committee to consider the necessary steps to put it in the best posture for insuring successful reaccreditation. The Committee functioned university-wide, and the department of romance languages also set up, to study aspects of the reaccreditation of particular relevance and importance to the department itself, an Organization and Administration Committee. Fernandez, as department chairman, had the responsibility for the formation and the composition of the Organization and Administration Committee. It consisted of four members, one being Fernandez, himself, as chairman. Another member was Mrs. Fernandez, who also was a tenured member of the department.

## 3. Free speech and free press exercise by Mayberry in the fall and winter of 1971–72.

Mayberry perceived Fernandez' self-appointment as stifling. In the fall of 1971, he went door-to-door to his colleagues in the department of romance languages and complained about the composition of the Organization and Administration Committee, asserting that it would preclude their feeling free to speak out about departmental problems perceived by them. He suggested that Fernandez should be disqualified to serve as a member of the departmental Organization and Administration Committee.[16]

**16.** A member of the department in Mayberry's probationary position had no basis, absent well-substantiated grounds which would render the department chairman unable to act objectively and free from vindictiveness, for seeking to disqualify the department chairman. Mayberry advances considerations of supposed personal antipathy between him and Fernandez, but the grounds advanced were far too slight to justify a Court's accepting that it should interfere in such circumstances to approve, much less bring about elimination of the man who was head of the department. *See Duke v. North Texas State University*, 469 F.2d 829, 838 (5th Cir. 1972).

The chairman, at the apex of the departmental hierarchy, was a virtually indispensable Organization and Administration Committee member, so the charge by Mayberry that his service would be improper practically amounted to a demand for the removal of Fernandez from the chairmanship of the department, or, at least, his emasculation in that role. Such an extreme remedy, in the interests of regularity and efficiency of administration, should be proposed to the dean, the chancellor, the provost, or the president, each of whom was a superior of Fernandez and, consequently, in a position to act on the recommendation of removal if it proved to be justified. Yet Mayberry never approached any of those University officials, although the University Faculty Manual gave him the authority to do so. There was an air of irresponsibility in "Down with the Boss" exhortations made to co-workers, to other members of the department, all serving at levels beneath the department head and unable, singly or collectively, to bring about Fernandez' removal. Judge Dupree, who presided at the trial, in dealing with post-verdict matters, concluded that, as an established fact, "the evidence reflected an insubordinate dimension to his [Mayberry's] protected criticism." *Cf. Roseman v. Indiana University of Pennsylvania, at Indiana*, 520 F.2d 1364, 1368 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), where the court, in affirming a finding for the university and stating that the teacher's critical remarks were not entitled to First Amendment protection, observed that "Roseman's [attacks] called into question the integrity of the person immediately in charge of running a department . . . [and] would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and coworkers." *See Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *cf. Bradford v. Tarrant County Junior College District*, 492 F.2d 133, 135 (5th Cir. 1974).

Hence, giving the strongest intendment to the plaintiff's side of the case, it must be assumed that the gravamen of Mayberry's complaint was a suggested stacking of the committee through the addition of Mrs. Fernandez, which arguably, if the husband and wife were to engage in block voting, would allow them to prevent anything they did not want, and assure

The word of mouth complaints of Mayberry against Fernandez were committed to writing in an anonymous letter to the University-wide Self Study Steering Committee. The letter was written by Mayberry's wife. Mayberry assisted in its preparation. Mayberry explained, and the jury was entitled to credit the explanation, that the letter was anonymous because of an understanding on his part, and on the part of Mrs. Mayberry, that it should be unsigned. The fact of anonymity, nevertheless, served substantially to reduce the possibility that, before April 13, 1972,[17] Fernandez had learned the identity of the source of the complaint against him.

Mayberry, in January or February, 1972, had completed, and filed with the Self Study Steering Committee, an unsigned questionnaire highly critical of Fernandez. Fernandez flatly denied that he knew that Mayberry had submitted the questionnaire, let alone that it was critical of him, until after April 13, 1972. Nothing in the evidence went to establish the contrary.

them a very strong position for maneuvering to get anything they did want.

If that was what was troubling Mayberry, he was in a vulnerable position to make the by-no-means trivial accusation that Dr. Fernandez and Mrs. Fernandez, by reason of their personal association, were unable to act impartially and professionally. Dr. Mayberry's wife was also a teacher at the University, likewise a member of the romance language department, whose consideration for tenure, even as that of her husband, was coming up in the 1971–72 academic year. Mrs. Mayberry was linked with Dr. Mayberry in firing one of the early shots against Fernandez in the intradepartmental fuss.

The hiring of qualified women who are wives of faculty members is a developing consequence of society's belated efforts to eradicate the stigma of second-class status for women. To lessen the likelihood of charges of spousal bias, it doubtless is preferable to work it out, where possible, so that one of the two spouses works at another, nearby institution, or at least in a different department of the university. But nothing in the record here suggests the availability of appropriate employment at another institution in the vicinity. Nothing suggests that chemistry majors will not be drawn, in selecting marriage partners, to chemistry

### 4. Extent of Fernandez' awareness, prior to April 13, 1972, that Mayberry had been critical of him.

Those were the facts as to (a) Mayberry's prospects for achieving tenure, assuming no interjection of retaliation for free speech exercise, and as to (b) the free speech on Mayberry's part which he claims led to retaliation. An obvious essential ingredient for the making out of his case is proof that Fernandez, before April 13, 1972, knew *both* that he was being criticized *and* that the criticisms emanated from Mayberry. "As a nontenured employee, he [a university professor] had the burden of proof." *Megill v. Board of Regents of the State of Florida*, 541 F.2d 1073, 1078 (5th Cir. 1976); *Johnson v. Cain*, 430 F.Supp. 518, 520 (N.D. Ala.1977) ("However, the burden of proof rests with the plaintiff to show that his dismissal was due to statements or other conduct protected by first or fourteenth amendment freedoms.").

The most that Mayberry, as plaintiff with the burden of proof, could produce as evidence as to any knowledge by Fernandez on

majors, and romance language specialists to romance language specialists. So it was with Dr. and Mrs. Mayberry, and Dr. and Mrs. Fernandez. Neither Dr. Mayberry nor Dr. Fernandez was in a position to complain that the wife of the other was employed by the University. Dr. Fernandez made no such complaint, for he recommended a grant of tenure to Mrs. Mayberry, which, in 1972, was offered and accepted.

When the University thus hired qualified women, it could hardly be faulted for extending to them the full rights associated with the positions they filled, including eligibility to serve on such a body as the Organization and Administration Committee. A mere hypothetical generalization that husbands and wives will always be inclined to be biased should not be allowed, in the absence of specific proof, to perpetuate the second-class exclusionary treatment to which women have, for far too long, been subjected. The record evinces no such particularized proof.

17. April 20, 1972 was the date on which Mayberry was informed that he would not receive a grant of tenure. Fernandez' recommendation to that effect was made to the provost on April 13, 1972.

or before April 13, 1972 of Mayberry's criticisms directed at him was:

1. Shortly before the tenure decision, in the Spring of 1972, Dr. Thomas Andrew Williams, a professor of French, recommended Mayberry for tenure. Fernandez responded that it was out of the question because Mayberry was a troublemaker. The statement was not elaborated or explained. There was no showing that it referred to speech or other form of protected expression—in particular, no showing that it related to Mayberry's criticisms.[18]

2. Mrs. Mayberry testified that, in a departmental meeting, Fernandez stated that he had been told that there was some unrest in the department concerning how the Operations and Administration Committee had been set up. There was no testimony, however, that Fernandez knew who was restive.

3. The Court asked Fernandez whether any information that Mayberry had been critical of him came to his attention before his decision concerning Mayberry's tenure. The answer was "Possibly yes," followed with the explanation:

I did not know when the Judge questioned me as to whether I had possibly heard anything about criticism before—I was referring to the fact that—I mean when you hear comments—how would I know if I did not hear any before April 15th. Maybe I did, but what I heard was just something that Mayberry was not very happy with my performance, but neither was Nancy Mayberry. She could have been more critical—neither was Lucy Wright—neither was John Costa. I do not think there is a Department in the world where everybody is happy with their Chairman. I never heard anything about this Self-Study about which there has been so much ado until after the tenure decision.

5. *University requirement that staff reduction in the romance language department take place.*

On the other hand, Fernandez explained in his letter of April 13, 1972 to the Provost, and orally to Mayberry the same afternoon, that he was not recommending tenure for Mayberry because of a need to reduce the number of faculty members proficient in Spanish, due to slackened demand in that area.[19]

### II.

### The Legal Consequences

A. *Impact of the Need to Reduce Staff*

█ It is our conclusion that, resolving all doubts in plaintiff's favor, and fully accepting that his remarks were entitled to

18. There were previous activities of Mayberry meriting description of him as a troublemaker, especially his insistence on teaching in English, rather than Spanish, despite a departmental policy to the contrary. The constitutional right to criticize a faculty colleague is the fundament of Mayberry's cause of action. He appears to wish to obliterate the right of the faculty chairman to criticize a subordinate, while exalting the right of the subordinate to criticize the chairman.

19. For a period of several years after April 20, 1972, it was, in fact, the case that the number of romance department faculty members remained reduced. The statistics fully substantiated the claim of lessened Spanish enrollments in years preceding the 1971–72 term. It is an inescapable conclusion that the provost had indicated to the dean and to Fernandez as department chairman that the department was overstaffed and had to be reduced. Fernandez understood that not all five romance language professors in their crucial tenure consideration year could be granted tenure. The other four made it. Mayberry was the low man on the totem pole and did not.

No one has ever seriously suggested that considerations of whether to grant tenure may not include need for the teacher, and whether there will be sufficient work to keep him busy. That is but another example that not everyone satisfying the requisite qualifications will necessarily be granted tenure. "Many are called, but few are chosen." American universities are replete with distinguished full professors who, when the time came at their first university, went "out" and not "up." It is not in any sense denigrating when a university concludes, at the moment of decision, that its best educational interests will not be served by a conferral of tenure, however capable and collegial the candidate may be. See n.29 *infra*.

First Amendment protection,[20] nevertheless he did not present a sufficient case to justify his going to a jury. First and foremost, long before Mayberry uttered any of the criticisms on which he has based his case, the department head, Fernandez, had already concluded that he would not recommend tenure if the department had to undergo any staff reduction. Fernandez, in reviewing the five candidates eligible for tenure consideration in 1971–72, knew that one had to be denied tenure, i. e., that staff reduction was required.[21]

**B.** *Weakness of proof of awareness by Fernandez that Mayberry was the source of the criticism*

Second, the evidence was very weak that Fernandez, before April 13, 1972, knew Mayberry was the source of the criticisms. At most it comes down to the fact that Fernandez testified that he "possibly knew." Mayberry, however, as the plaintiff, had the burden of persuasion. A statement that one possibly knew implies that he possibly did not know, leaving things very close to an even balance. Chief Judge Sobeloff put it well when he observed that an issue can only be submitted to the jury when it is supported by "[e]vidence which shows a 'probability' and not a mere 'possibility.'" *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 168 (4th Cir. 1957), *cert. denied*, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957); *accord Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958); *Bryan v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.*, 565 F.2d 276, 281–82 (4th Cir. 1977), *cert. denied*, 435 U.S. 943, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978).

**C.** *Insufficiency of June, 1972 events to prove causality with respect to April, 1972 recommendation that tenure not be granted.*

Plaintiff seeks to make much of the fact that, in early June, 1972, Dr. Mayberry and Mrs. Mayberry met separately with Fernandez. Each quoted him as accusing Mayberry of being a troublemaker in his critical observations about Fernandez to the Self Study Steering Committee, thereby stirring up trouble. He was quoted as adding that further adverse conduct by Mayberry would result in his immediate termination. Dr. Williams, the French Professor, quoted remarks to like effect made by Fernandez at the time in June, 1972 when Williams suggested reconsideration of the decision not to offer tenure to Mayberry. Fernandez stated to Williams that he would not have someone like that tenured in the department. Fernandez' demeanor at the June meetings was described as angry.

Mayberry would relate those occurrences back two months or more to the period prior to April 13, 1972 on a theory that Fernandez had been harboring hard feelings all that time. It is, however, simply too thin, considering the evidence as a whole. The June anger, in the circumstances, is much more probative of contemporary identification of the critic at a time well after the tenure decision had been reached.

**D.** *Legal irrelevance of fact that two granted tenure did not have Ph.D. degrees.*

There is another fact which should be mentioned in this connection. At the time Fernandez declined to recommend tenure for Mayberry, he gave favorable consideration to 4 other candidates, among them Mrs. Mayberry.[22] Of the 4 granted tenure, 2

**20.** See, however, *Shaw v. Board of Trustees of Frederick Community College*, 549 F.2d 929, 932 (4th Cir. 1976); *Chitwood v. Feaster*, 468 F.2d 359 (4th Cir. 1972); *Williams v. Day*, 412 F.Supp. 336, 340 n.1 (E.D.Ark.1976), *aff'd*, 553 F.2d 1160 (8th Cir. 1977).

**21.** Mayberry seeks to aggregate apples and oranges in pointing to others at or about the same time hired by the department. Nonten-

ured, probationary teachers who can be terminated on notice of a year or less are simply not comparable to essentially permanent tenured professors.

**22.** The jury was not required to give weight favoring Fernandez to his treatment of Mrs. Mayberry. Nevertheless, it does attenuate Mayberry's theory of recovery, for it is unlikely in the extreme to think that, knowing the joint

(Mrs. Mayberry included) had earned the Ph.D.; 2 had not. Mayberry had since 1968 been a Ph.D., and the University normally required a Ph.D. for a grant of tenure, although waivers of that requirement had, with some frequency, previously occurred.

No great weight can, with respect to a First Amendment violation claim, be assigned to the fact that several candidates to whom tenure was granted in 1971–72 lacked the Ph.D. degree, while Mayberry had been a doctor of philosophy since 1968. The doctorate or lack thereof theoretically could make a difference "all other things being equal." But things, when teaching qualifications are being examined at the university level, are practically never equal. Human personalities come in myriad forms, capabilities and sizes, and, in determining whether or not to grant tenure, it is appropriate not to accord controlling weight to any single indicator. The doctoral degree is but one of a number of factors to be considered when the question of whether to grant tenure is addressed. Its presence by no means guarantees a grant of tenure. Its absence by no means prevents a grant.

There consequently must be something more than proof of Mayberry's Ph.D., and the lack of that academic merit badge on the part of another, successful candidate.

E. *Non-recusal of Fernandez with regard to the tenure recommendation respecting Mayberry.*

No more does it advance Mayberry's case to point to the fact that Fernandez, who became his adversary, by virtue of his recommendation to deny tenure, did not recuse himself. It will not suit to fashion a rule, or reach a result which, in its consequences, will expose universities to great turmoil and expense, unless they automatically rear-

range the departmental structure to remove the department chairman or other evaluating faculty members from further participation as to a particular candidate for tenure everytime sparks fly. *See Megill v. Board of Regents of the State of Florida*, 541 F.2d 1073, 1079 (5th Cir. 1976). The inordinate increase in cost and the elimination of effectiveness which manifestly would attend any such rule are all too evident. Such a rule would be an open invitation to manipulative activities by a candidate to neutralize consideration by a department chairman who the candidate had cause to believe did not, for adequate reason, favor a grant of tenure.

The evidence must, therefore, be substantial that the senior faculty member participating in the evaluation process of a candidate for tenure has so lost his objectivity that he no longer is able to look on the task from the university's perspective, but instead has personalized it and converted it into something approaching a personal vendetta. *Duke v. North Texas State University*, 469 F.2d 829, 834 (5th Cir. 1972).

F. *Absence of sufficient causal connection between Mayberry's criticisms and Fernandez' recommendation not to grant tenure.*

The law is a study and function of human life, not an exercise of automatons. It is, consequently, an aggregate of approximations, not an exact science. So a resort to percentages to demonstrate a point is only to provide an illustration, not to suggest that sufficiency of the evidence can be reduced to such mathematical precision.

With that *caveat* in mind, let us suppose that for either of the two factors in the equation, standing alone, there was sufficient evidence to have supported a jury

participation by the Mayberrys in the criticisms, Fernandez would treat them differently. It suggests, rather, that he did not have the knowledge on April 13, 1972. Deriving from the evidence a conclusion that retaliation was Fernandez' motive is rendered practically impossible by the consideration that, if Fernandez wanted, for unjustified reasons of personal animus, to get rid of Mayberry, it would have been

inconsistent not to have treated Mrs. Mayberry in the same fashion. Fernandez, if he was ruthlessly retaliating, presumably would have wanted to promote and orchestrate a departure from his vicinity of Mayberry. Yet to facilitate permanent employment by the University of Mrs. Mayberry, as Fernandez did through the recommendation of her for tenure, tended to the exactly opposite result.

verdict in Mayberry's favor. The two factors are, of course, (a) a favorable prospect, before his protected criticism was uttered, of Mayberry's receiving tenure, and (b) some degree of assurance with which it could be said that Fernandez knew of the criticisms as originating with Mayberry before he, on April 13, 1972, submitted his recommendation that Mayberry not be granted tenure. The evidence favoring Mayberry on either factor, standing alone, while weak, still, we may assume, would have sufficed for a jury verdict in Mayberry's favor. Let us, as best we may, recognizing that we thereby substitute an apparent simplicity for an actual complexity, assign values of 5% and 8% likelihood respectively. If one of them had been at the virtual certainty level,[23] the case would hold at the 5% to 8% range of probability. But both were far from the virtual certainty level, and multiplication of the two, one against the other, yields a figure of less than .005. That is, the causality percentage of the case, for which Mayberry, as plaintiff, had the burden of proof was but 4/10ths of 1%. Put another way, it is 99.6% certain that denial of tenure was not associated with the protected criticism. In the real, everyday world, the residual 4/10s of 1% is less than a scintilla, and the case falls for failure of proof.

Against the strong probability that tenure would not be forthcoming for Mayberry, the evidence that Fernandez retaliated for reasons of free speech exercise is just too attenuated, especially evidence of the essential causal link, namely, knowledge by Fernandez by April 13, 1972 that Mayberry was the source of remarks critical of him.

*See Chambliss v. Foote*, 421 F.Supp. 12, 15 (E.D.La.1976) ("The evidence does not support a finding of any causal connection between the statements made or demonstrative activities engaged in by the plaintiff or her husband and the non-renewal of her contract."), *aff'd on basis of the district court's opinion*, 562 F.2d 1015 (5th Cir. 1977), *cert. denied*, 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978); *Markwell v. Culwell*, 515 F.2d 1258 (5th Cir. 1975).

All in all, therefore, both obstacles in Mayberry's path, combined, have proven too much for him to overcome, even assuming that, had but one of them existed, his evidence would have been sufficient to surmount it.

G. *The nature of a tenure grant at the university level, and the absence of stigma in a failure to receive tenure.*

To counter that reduction of the plaintiff's case to or below the *de minimis* level, Mayberry can point to something which he may argue augments the figures to his favor, enhancing the likelihood that he would have been granted tenure, were it not for the criticism. In his fifth continuous year at the University, he could call attention to four occasions (indeed to five, counting the final year allowed in order to comply with the rule requiring 12 months' advance notice of non-reappointment) when his work was deemed so satisfactory that the University renewed his teaching contract. That, Mayberry can contend, raised his probability of receiving tenure to a virtual certainty, there having been no evidence of any prior effort to terminate him, but, on the con-

**23.** *Cf.* the *Selzer* case cited in note 11 *supra*. See *Gieringer v. Center School District No. 58*, 477 F.2d 1164 (8th Cir. 1973), *cert. denied*, 414 U.S. 832, 94 S.Ct. 165, 38 L.Ed.2d 66 (1973) (teacher got on well professionally with his superiors, receiving satisfactory or better ratings. "The sole exception arose out of an impromptu report delivered by Gieringer at a meeting of the ... teachers' association.... The subject of this report related to the school district's financial ability to raise teachers' salaries."); *Johnson v. Branch*, 364 F.2d 177 (4th Cir. 1966, *en banc*), *cert. denied*, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967); *Guerra v.*

*Roma Independent School District*, 444 F.Supp. 812 (S.D.Tex.1977) ("All four teachers in question were praised by their supervisors; both their principal and their superintendent recommended that their three year contracts be renewed. No dissent from these evaluations or recommendations came in evidence.... they were penalized for their political associations...."); *Johnson v. Butler*, 433 F.Supp. 531 (W.D.Va.1977). As to the other prong of the case, suppose that Mayberry had signed the anonymous critical letter and posted it directly to Fernandez.

trary, a reiterated expression of satisfaction with his work.

There is some immediate surface plausibility to the argument, but it dissipates entirely following a review of just what appointment, at a university level, to tenured status signifies—and, even more to the point, what non-appointment does not signify.

There appears to lurk in some quarters a belief that the jury would have been within its rights to infer from five years of continuous service by Mayberry, satisfactory enough to merit repeated yearly reappointment for yet another year, that some unworthy reason must have underlain his failure to win tenure, and that negative reaction to his unfavorable criticism was, indeed, the occasion of unmerited mistreatment. Such a suspicion is no more than that, unsupported by evidence, and at complete odds with the concept of tenure as it exists in American institutions of higher learning.

To address that point will necessitate a rather detailed description of the tenure concept. The rules governing teacher employment status at institutions of higher learning such as the University, as is customarily the case throughout the United States, derive primarily from generally applicable, nationwide principles. While professors and instructors, on the one hand, and individual institutions, on the other, may make overriding agreements which will, naturally, take precedence, they are not usual. In the case of the University and Mayberry, rather than any inconsistent, specialized terms controlling, the University Faculty Manual, to the extent here relevant, coincides with or supplements the generality.

As an authoritative source for the applicable rules we turn to *Faculty Tenure, A Report and Recommendations by the Commission on Academic Tenure in Higher Education*, 1973 (hereafter "Faculty Tenure"). As stated in the Preface to that book:

> The Commission on Academic Tenure in Higher Education was established during 1971 and worked under a grant from the Ford Foundation. The commission was jointly sponsored by the Association of American Colleges (AAC) and the American Association of University Professors (AAUP), two organizations with a long history of joint activity in the development of policies relating to higher education. In particular, the AAC and the AAUP were the framers of the 1940 Statement of Principles on Academic Freedom and Tenure, the fundamental document on the subject. The 1940 statement was a restatement and expansion of the 1925 Statement on Academic Freedom and Tenure, prepared by a conference of educational organizations, including the AAC and the AAUP, convened by the American Council on Education. The 1925 statement, in turn, had replaced the original 1915 Declaration of Principles drawn up by the Committee on Academic Freedom and Tenure of the AAUP and endorsed by that association in 1915–1916.

> By 1970, the 1940 Statement of Principles on Academic Freedom and Tenure had been officially endorsed by eighty-one professional organizations. It had been incorporated, explicitly or by reference, in detail or in principle, in the policies of most of the institutions of higher education in the United States....

> .    .    .    .    .

> In 1971 the AAC and the AAUP created the Commission on Academic Tenure as a separate, autonomous unit. It was to design and carry out its own program of investigation and make its report directly to the academic community and the general public, without reference to the sponsors. This agreement was expressly understood by all members of the commission and has been scrupulously observed. *Faculty Tenure*, therefore, presents the views of the Commission and not those of the AAC or the AAUP or the Ford Foundation.

From *Faculty Tenure*, the following picture evolves, both from an historical point of view, and as things are now:

1. After a varied history of ups and downs, the status of university teachers had

sunk to where, by the latter days of the Nineteenth Century, everyone served at the will of the university administrators. Practically no one had formal assurance of continued employment. *See Faculty Tenure,* 122–23, 127–28, 135.

2. In 1900, an egregious endeavor by a most substantial financial backer and sole trustee of a distinguished institution, Stanford University, to bring about the dismissal of an established professor because the financial backer disliked his professional views, served as a catalytic agent toward the development of do's and don'ts regarding dismissal of established university professors. *Id.* 137–42. The major initial objective was protection of academic freedom, the elimination of thought control, and the outlawing of punishment for "unacceptable" ideas. *Id.* 137, 143–44.

3. There has evolved the concept of tenure, a conferral of status on proven scholars which, absent considerations not directly involved in the present case (namely, demonstrated incompetence, moral turpitude, financial exigency or program elimination) insures permanent employment from the time of grant of tenure until the reaching of retirement age.

4. The status of tenure, effectively precluding, as it inevitably does, for possibly a very long time, the replacement of a less good teacher by a better one, is recognized as carrying with it a duty that great care be exercised in its conferral.[24] Only schol-

ars of proven distinction are deemed to merit tenure. *Id.* x, 59:

In the real world, a probationary period is necessary, and tenured status must rest upon explicit judgment.

... *The commission recommends that the award of tenure always be based on an explicit judgment of qualifications, resulting from continuous evaluation of the faculty member during the probationary period, in the light of the institution's stated criteria.*

(Emphasis in original.) Demonstration of factors well beyond the mere passage of time in service,[25] namely (a) creditable scholarship, (b) accomplished pedagogy, (c) able service to the university in matters associated with its maintenance, operation, growth and continued endurance, and (d) developed collegiality—the capacity to relate well and constructively to the comparatively small bank of scholars on whom the ultimate fate of the university rests[26]—is required by the university, and should be established before a candidate is granted tenure.

Faculty members in universities in general who had proven their own worth appreciated the possibility of pollution of the academic atmosphere, in which their own lives were conducted, through indiscriminate admission of insufficiently tested candidates who might prove to be unproductive, uncollegial, or both.[27]

5. Out of that requirement of demonstration by the would-be tenured teacher of

---

24. Byse, *Academic Freedom, Tenure and the Law: A Comment on Worzella v. Board of Regents,* 73 Harv.L.Rev. 304, 305 n.4 (1959):

It must be recognized that tenure can become an instrument to perpetuate incompetence and mediocrity rather than to advance scholarship and talent. But the fact that tenure can be debased does not mean that it is less valuable. It means only that other processes must not be neglected—including careful selection of those to whom tenure is awarded.

25. *Id.,* "*The commission urges that tenure never be acquired by default, through the mere passage of time in probationary service.*" (Emphasis in original.)

26. In the words of the University Faculty Manual, a factor to be considered in evaluating

salary increases and promotion in rank (including conferral of tenure) is "construct:ve relationship with colleagues." *See Watts v. Board of Curators, University of Missouri,* 363 F.Supp. 883, 890 (W.D.Mo.1973), *aff'd,* 495 F.2d 384 (8th Cir. 1974) ("It was proper in reaching a judgment of suitability for a permanent position in a faculty to consider whether or not Plaintiff was a good colleague to other members of the faculty."). *See Duke v. North Texas State University,* 469 F.2d 829, 838, 840, 841 (5th Cir. 1972); *Faculty Tenure,* 190.

27. *Faculty Tenure,* 150; 190:

The probationary faculty member must convince his colleagues and administration by his performance and continued promise that he merits tenure; any doubts must usually be resolved against him.

important developing qualifications and qualities,[28] has arisen the concept of probationary status customarily accorded to beginning teachers.[29] Usually, at the outset, employment is for a single year, though regularly the requirement of prior notice (here a year) of non-reappointment extends duration of the service period by the length of the required period of notice. Such employments in probationary status were dealt with in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which held that they created no expectation of continued employment or other property interest and no right to a hearing.

*Faculty Tenure* emphasizes that the probationary status should not be too short,[30] and sets as a desirable maximum seven years of employment in that category (six years of probationary status, with the deci-

sion on tenure in the sixth year, and, absent a grant of tenure, one terminal year, with no hope for tenure and no possibility of further reappointment). *Id.* 61 ("Allowing for a full year's notice in the event of an unfavorable decision, this means an effective probationary period of six years . . . .").[31]

It is a fact of basic importance that *nonrenewal*, following the running of the established probationary period, is not a *dismissal*, and is altogether lacking in invidious connotations.[32] There are numerous factors apart from the probationer's level of competence entering into the decision whether to confer tenure—the *sine qua non* for remaining in a university's employ after expiration of the probationary period. It is not a criticism to be denied tenure.[33]

The University's system with which we here deal did *not extend its probationary*

28. *Id.* 62.

29. *Faculty Tenure*, 119:
Much later, a time limit on temporary service would be seen as serving another function—of providing a period of probation in which the novice would gain the benefit of an internship and the institution the benefit of a second look before making a permanent commitment.
Today, the probationary period is universal. *Faculty Tenure*, 257 defines it as
a period of professional service during which a faculty member on *term appointment* does not hold tenure and is observed by his colleagues for the purpose of evaluating his professional qualifications. At the end of this period, the faculty member either receives *academic tenure* or is not reappointed.
(Emphasis in original.) It should be constantly borne in mind that
A dismissal proceeding is different from a tenure-review process. Specifically, in a dismissal proceeding, the institution brings charges against a faculty member (charges such as inadequate performance of duties, incompetence, or misconduct) with the clear design of ridding itself of an undesirable employee. . . . A tenure review, in contrast, is concerned with whether or not to grant tenure in light of the departmental or academic program needs, prevailing economic and budget considerations, the qualities of the particular candidate, and the existing job market. Tenure review obviously never applies to a person who already has tenure, whereas a dismissal proceeding could. Theoretically, separation from an institution be-

cause tenure was not granted carries no professional stigma; dismissal for cause clearly does. . . .
*Id.* 197.

30. *Id.* 65:
*The Commission recommends retention of the seven-year period as the maximum for probationary service, and recommends that institutions, as a matter of policy, use probationary periods of not less than five years.*
(Emphasis in original.)

31. *Cf.* the generally accepted 1940 Statement of Principles on Academic Freedom and Tenure (*Faculty Tenure*, 249 ff):
. . . the probationary period should not exceed seven years. . . . Notice should be given at least one year prior to the expiration of the probationary period.

.   .   .   .   .

32. *Id.* 153:
Not everything in the 1940 Statement [of Principles on Academic Freedom and Tenure, jointly issued by the AAUP and the AAC] went to shoring up security. Considerable attention was paid to competing values—institutional flexibility, quality control. Thus, it reaffirmed the proposition that tenure alone conferred judicial citizenship and that probationers could be let go at the expiration of a term appointment, provided due notice had been sent.
Dr. Mayberry, of course, received the requisite notice of nonrenewal. *See* n.6, *supra*.

33. *Id.* 69:

status period to the outside maximum allowable under what *Faculty Tenure* has reported to be the customary guideline. Nor did it shorten it to less than the recommended minimum. The University called for the tenure decision in the fifth year, one year earlier than the maximum allowed and the very minimum suggested in *Faculty Tenure*, with a terminal sixth year. In higher education generally, a period of probationary status greater than six years (plus one notice year) would be frowned on, and anything longer than that is apt to be deemed to have operated to create actual or *de facto* tenure. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ Obviously, at some point, the teacher is entitled to a decision, and cannot be kept dangling too long. The University, since it

> It is essential that institutions, faculty, student, and the general public understand the important distinction between *dismissal* and nonreappointment or *nonrenewal* .... Unfortunately, these two terms are too frequently used as synonyms.... Reference is often made to those whose probationary contracts are not renewed as having been "dismissed." The distinction is of immense importance, and it must be preserved if sound personnel practices are to have any prospect of success.
>
> Dismissal, whether during a term or a tenured appointment, is a grave action, which should be undertaken only for cause, with full procedural safeguards, and with the burden of proof resting on the institution to demonstrate before proper tribunals that dismissal is warranted.
>
> ... But the decision not to reappoint or not to grant tenure is not a form of dismissal. Nonreappointment is a regular and indispensable feature of any tenure system that includes a selection process resting on probationary service. Only if probationary periods are truly probationary, only if some are selected for continued service and others are not, will tenure have any significance as the principle for assembling the faculty best suited to the institution's present and future needs.
> *Id.* 256–57.

**34.** In this important regard, Mayberry's position was to be contrasted with the situation in *Board of Regents v. Roth, supra*, where the plaintiff had only served one initial year of a probationary period fixed at a maximum of four years by the educational policy of the State of Wisconsin. Hence, should it have been determined that Roth's nonreappointment

was well within the guidelines, was acting in accord with accepted university practices. It was, therefore, entirely appropriate that Mayberry, in his fifth year, was still a probationary teacher. His employment, covered by his contract for the fifth year, would be fully subject to nonrenewal, and, indeed, would have to terminate subject to the extra year required to satisfy notice obligations. Unlike the situation in all previous years, Mayberry, in the fifth year, was no longer eligible for reappointment to further *probationary* status for another year.[34] The fifth was the last possible year in probationary status. Following it were only two possibilities: (1) he would serve out his sixth, or terminal (no longer probationary), year and then depart,[35] or (2) he would be granted tenure—a significantly different status—effectively a new job.

was due to infringement of First Amendment rights, the remedy of reinstatement would have served to continue him *in the same category*. The reinstatement would be for an additional year in probationary status. That is altogether different from the "reinstatement" sought by Mayberry. His claim is to permanent, i.e., tenured employment, in place of the one-year probationary status which was all he was entitled to prior to the time when the supposed imbroglio on which this law suit centers was set off by his remarks about his department chairman. Mayberry's probationary status having reached the stage where it no longer was extendable or renewable, Mayberry had to succeed in the upward leap to a tenured position, or leave. The difference is a fundamental one. A one-year extension of probationary status simply does not entail the permanency of employment that a grant of tenure confers. Mayberry received a one-year extension, covering the year following the 1972 decision not to grant him tenure. *See* n.6, *supra*.

**35.** It must be appreciated that other factors than simply the competence of the candidate for tenure are involved. A university is compelled to employ the system of "up or out" (*see Faculty Tenure*, 121–22) even in the case of very good teachers, not because of a streak of cruelty but because of the university's nature as a living and growing organism. Since a university's life should be structured as much as possible to allow opportunities for some of each new year's crop of incipient scholars to be considered for entry into the intellectual continuum, such freedom to terminate those considered for, but not granted tenure, even though qualified, is necessary to make place for those following behind.

Note 35—Continued

Otherwise a university's teaching positions would, in a short time, all be permanently filled, with consequently change and growth among its faculty restricted to the relatively infrequent occurrences occasioned by death, retirement or resignation. Resignation, of course, would usually, if not predominantly, come from the very best members of the faculty whose excellence has assured that there is a competing demand for their services. Other institutions will be constantly seeking to woo them away. Those are the professors to whom a grant of tenure has or will come almost as a matter of course. They are the teachers who, insofar as their personal security is concerned, have the least need for a tenure system. *Faculty Tenure*, 117. Yet, for them, the insurance of the institution's integrity which a functioning tenure system is designed to guarantee is of such importance that it is regarded as altogether unlikely that the best could be lured to join the faculty of a university in the first place without a sound tenure system.

If, in short, a grant of tenure were merely a function of competence and passage of the probationary period, a potentially moribund academic society would emerge, with devastating consequences for the success, and ultimately the future of the educational entity.

Indeed, it merits emphasis that all the qualifications in the world do not guarantee a grant of tenure. The need not to have too many in a department of the same age group, the corresponding need to hold open permanent positions for filling with scholars who come along some years later, thereby promoting a desirable age distribution, are factors properly to be taken into account. It may and does happen that two eminently qualified scholars may arrive at the tenure decision rung in the ladder at exactly the same time. One may be granted tenure and the other not though everyone concerned would agree that a reversal of the decisions would make as much or as little sense.

Going one step further, a department chairman would be acting well within his rights to recommend that neither of the two eminently qualified candidates be granted tenure, simply because the departmental age patterns make it reasonable to wait several years in the hope that someone providing a better age fit will appear with qualifications comparable to, or even superior to those of the two currently under consideration. Permissible reasons for a non-grant of tenure include, *inter alia*, "(2) performance and qualification which although satisfactory will not enable the institution to achieve its educational objectives and standards." *Faculty Tenure*, 70.

And there may be, as there was in the University's case, a decline in demand for certain courses (here Spanish) which created another factor of relevance to the decision of whether or not to grant tenure. Among other permissible grounds are:

. . . (3) full staffing at the tenure level in the areas of the candidate's principal competence or specialty; (4) changes in the institution's academic program; (5) budgetary constraints which make it impossible or imprudent to renew the appointment or to increase the tenure staff.

*Id.*

In short, it by no means follows that everyone arriving at the year in which consideration for tenure must take place will be selected for tenure, however qualified the teacher may be. It simply is not an acceptable legal progression to go from (a) Mayberry was qualified, to (b) he exercised free-speech rights, to (c) what he uttered was critical of Fernandez, to (d) and, since he was qualified, the explanation of the non-grant of tenure must be the impact of Mayberry's exercise of his free-speech rights. The inference is unwarranted, the syllogism flawed. Even apart from the failure of proof that Fernandez, at any time prior to April 13, 1972, knew of Mayberry's direction of criticism at him and the abundance of proof that the decision would, in all events, have run against Mayberry because of the need to reduce staff, there still must be a basis to support a finding that Mayberry was turned down for tenure because (a) Fernandez, in giving any weight to the free speech exercise by Mayberry, did so in terms of "He's qualified, and, beyond that, I would have favored tenure for him, had he not said what he said, but I'll fix him for being critical of me." In the particular present case, because of the plaintiff's failure to prove essential items of Mayberry's case in chief, the question does not arise. But it merits mention that, even with a *burden shift to Fernandez through adequate proof that he knew before April 13, 1972 that Mayberry had been critical of him, nevertheless, defendants should not be held liable if they could prove that Fernandez considered the criticisms only in terms of "Is a man who says such things, lacking in taste, if not scurrilous, of me or anyone else, the kind of person, with the requisite degree of collegiality, on whom we want to confer one of our limited number of tenured positions?" Or that, having considered it in that light, Fernandez decided not to recommend a tenure grant.

To that extent, one may, without offending the Constitution, base a decision not to recommend tenure on the content of remarks, although they enjoy First Amendment protection. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

It is remarkable that Mayberry, himself, recognized, before things developed into litigation, that his behavior had left something to be desired in the area of interpersonal relationships. On January 25, 1973, he wrote to Fernandez apologizing, saying: "I deeply regret my unkind actions. Would you please accept my apology . . . for all the displeasure that I may have caused you this year."

In establishing that, where other, permissible grounds existed supporting a decision not to rehire a teacher, a Board of Education might take into account the First Amendment protected conduct to make it more certain of the correctness of its decision, the Supreme Court held:

> This is especially true where, as the District Court observed was the case here, the current decision to rehire will accord "tenure." The long-term consequences of an award of tenure are of great moment both to the employee and to the employer. They are too significant for us to hold that the Board in this case would be precluded, because it considered constitutionally protected conduct in deciding not to rehire Doyle, from attempting to prove to a trier of fact that quite apart from such conduct Doyle's record was such that he would not have been rehired in any event.

Note 35—Continued
*Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) has this trenchant observation:

> One plausible meaning of the court's statement is that the Board and the Superintendent not only could, but in fact *would* have reached that decision had not the constitutionally protected incident of the telephone call to the radio station occurred. We are thus brought to the issue whether, even if that were the case, the fact that the protected conduct played a "substantial part" in the actual decision not to renew would necessarily amount to a constitutional violation justifying remedial action. We think that it would not.
>
> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against

*Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

Those consequences of reaching the fifth year as a probationary teacher were well known to Mayberry. They generally pertain to recommended university policy. Under them, Mayberry's old job with the University had to come to an end. Only if he should be selected by the University for the new job—that of, tenured professor—might he remain.

To reiterate, it was not enough for Mayberry simply to show an exercise of First Amendment rights, followed by a denial of tenure. That *post hoc propter hoc* approach[36] wrongfully eliminates the manifold other requirements to be satisfied, some quite independent of the candidate's qualifications, before tenure is conferred.[37]

> him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

(Emphasis in original.) That statement respecting a teacher at the secondary school level is *a fortiori* true of a university professor, where department groups are customarily smaller and collegiality a factor of greater importance. We have, here, of course, no occasion to inquire whether a different rule, more stringent for the teacher, might apply for universities in view of the dissimilarity in educational levels and objectives.

*Accord Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). *Cf. Cherry v. Burnett*, 444 F.Supp. 324 (D.Md.1977).

**36.** Such an approach manifestly would bring the entire delicate process of teacher staffing in American universities to a screeching halt. Dr. Fernandez was known to play a paramount role in the tenure decision, and if the *possibility* of retaliation were all Mayberry had to prove to allow a jury to find in his favor, there would be no practical way to deny tenure to anyone.

**37.** University budgetary considerations, projected increases or declines in the expected number of students and the courses they might be interested in pursuing, the candidate's rela-

If the two quite distinct types of employment: (a) probationary, with no assurance of reappointment after the fixed contract period and (b) tenured, with virtually guaranteed employment until the age of retirement is reached, related to two different employees or candidates for employment, the grounds on which the claims of the plaintiff rest would largely evaporate. Someone from outside the university would have an almost impossible task, given the many and varied, inevitably subjective factors,[38] going into a decision to offer tenure,[39] in establishing that he would have been tendered tenure employment but for something he said or wrote which fell within the protection of the First Amendment. *Cf. Franklin v. Atkins*, 562 F.2d 1188 (10th Cir. 1977), *cert. denied*, 435 U.S. 994, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978). So far as the probationary employee *in his final year* is concerned, he is in a comparable status as to what he must prove, since for the one time only he is formally under active consideration for tenure. His advantage lies simply in the fact that improbability will not seem quite so rampant with respect to any claim by him of First Amendment violation because of his prior intimate association with the institution and its faculty.

▪ Thus, no inference favorable to Mayberry's case is to be drawn from his previous satisfactory, annually renewed probationary service. The attempt to step up to tenured status introduced too many other considerations which would explain what

happened to permit the jury to decide that Mayberry was in some way mistreated simply because his connection with the university was allowed to come to an end after five one-year renewals of his probationary status.

### III.

*The Remarks of Mayberry Have Been Assumed to Have the Status of Constitutionally Protected Utterances*

There is no suggestion intended that the First Amendment is totally vitiated in tenure cases. We do not accept appellants' contention that the remarks by Mayberry merely reflected bickering, disruptive of harmony not entitled to any First Amendment protection, a route to decision followed by a number of courts confronted with litigation not unlike the present case. *See Roseman v. Indiana University of Pennsylvania at Indiana*, 520 F.2d 1364, 1368 (3d Cir. 1975) ("... we have concluded that plaintiff's communications fall outside the First Amendment's protection."), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976).[40] We are loath to say that there was no First Amendment dimension whatever to utterances by Mayberry so that, even had the evidence sufficed to support a finding that, if Mayberry's criticisms had not been made, Fernandez demonstrably was prepared to recommend him favorably for tenure, still Mayberry could not have recovered. *See Givhan v. Western Line Consolidated School District*, 439 U.S.

---

tionships to other professors in the department, the possibility, in terms of age, of foreclosing future tenure grants over too long a period, the compatibility or incompatibility of the candidate's theories and methods of instruction, to mention but some major considerations.

**38.** *Clark v. Whiting*, 607 F.2d 634, 639 (4th Cir. 1979):

A teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests.

*Mabey v. Reagan*, 537 F.2d 1036, 1044 (9th Cir. 1976).

**39.** Encapsulated: scholarship capabilities, teaching proficiency, quality of service to the university, and collegiality.

**40.** *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Chitwood v. Feaster*, 468 F.2d 359, 360–61 (4th Cir. 1972); *cf. Schmidt v. Fremont County School District No. 25*, 558 F.2d 982 (10th Cir. 1977); *English v. Powell*, 592 F.2d 727, 732 (4th Cir. 1979); *Cooper v. Johnson*, 590 F.2d 559, 562 (4th Cir. 1979).

*But see Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Jawa v. Fayetteville State University*, 426 F.Supp. 218, 229–30 (E.D.N.C.1976), *aff'd without opinion*, 584 F.2d 976 (4th Cir. 1978).

410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Similarly, we are not disposed to conclude that Mayberry's expressions were only a jumping of the gun, no more than an attempt to erase the handwriting on the wall. The record, while indicating that Mayberry's disappointment was, in point of fact, inevitable because of the necessity for staff reduction in the department, did not establish that he knew so when he made his protected criticisms.[41]

## IV.

### Conclusion

In conclusion, we observe that the law, in its insurance of justice in one context, should not, unwittingly, become a tool for meting out injustice in another. It is for that reason that more than suspicion, more than unproven possibilities are required before the Court may intervene in the operation of the tenure conferring process.[42] It is our conclusion that Mayberry's case rested on no more than unsubstantiated conjecture, and must be decided against him, the party on whom is placed the burden of persuasion.[43]

*REVERSED.*

---

**41.** *Cf. Johnson v. Cain*, 430 F.Supp. 518, 520 (N.D.Ala.1977); *Russo v. Central School District No. 1, Towns of Rush, et al., County of Monroe, State of New York*, 469 F.2d 623, 633 (2d Cir. 1972), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973).

**42.** *Faculty Tenure*, 188:

Courts have generally been reluctant to interpose their authority to develop a special subfield of substantive law for academic tenure.

The courts have not even begun to determine, as Nathan Glazer has put it, "what a university requires and may properly demand of a faculty, quite independent of any constitutional standard." Glazer's construction of tenure distinguishes sharply "between a man's role as a citizen and his role as a member of an institution with some autonomy." Like Perkins, he is fearful of putting the university at the mercy of lawyers and judges, who may, in the course of developing their legal positions, "come to views of the limits of free speech and the proper tests that may determine these limits that are in one way or another contradictory to the essential purposes of a university." Although the constitution fully protects a citizen, Glazer argues that it should not protect him fully in his academic role. Tenure cannot allow professors to urge a university's physical destruction, for example, regardless of whether such speech breaches constitutional standards [i. e., is or is not protected speech].

**43.** There also remains the pendent state claim of an alleged breach of contract. The contract is essentially the Faculty Manual of the University, only parts of which appear to be contained in the record. Nothing therein substantiates the claim of breach of contract. The assertion essentially boils down to the contention that Mayberry's academic freedom rights have been infringed. However, in the context of the case, that amounts to no more than a reassertion, in a different guise, of the First Amendment invasion claims. *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973):

However, we do recognize that, although academic freedom is not one of the enumerated rights of the First Amendment, *Parducci v. Rutland*, 316 F.Supp. 352, 355 (M.D.Ala. 1970), it is now clear that academic freedom, the preservation of the classroom as a "market place of ideas," is one of the safeguarded rights. *Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972).

Accordingly, the pendent state claim falls with the federal claim. *Cf. Hostrop v. Board of Junior College District No. 515, Counties of Cook and Will and State of Illinois*, 523 F.2d 569, 580–81 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976).