Roger M. LEACHMAN, Plaintiff,

v.

RECTOR AND VISITORS OF the UNIV-
ERSITY OF VIRGINIA, Ray W.
Frantz, Jr., and Julius P. Barclay, De-
fendants.

Civ. A. No. 87–0051–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 26, 1988.

James Hingeley, Boyle and Bain, Char-
lottesville, Va., for plaintiff.

Roger S. Martin, Associate Legal Advis-
er and Special Asst. Atty. Gen., Charlottes-
ville, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This action is before the court on a mo-
tion by the defendants for summary judg-
ment. Jurisdiction in this action is appro-
priate under 28 U.S.C. § 1343. For the
reasons stated below, the defendants' mo-
tion is granted.

I. *Background*

The plaintiff, Roger M. Leachman, has
been employed by the University of Virgi-
nia to work in Alderman Library in various
capacities since 1973. In October, 1976,
plaintiff began serving as Director of Ref-
erence Services. In February, 1984, de-
fendant Ray W. Frantz, Jr., University Li-
brarian, relieved plaintiff of that position
and assigned him to the newly created posi-
tion of Senior Reference Librarian. Plain-
tiff maintained the same faculty rank and

received the same compensation as he had received previously.

By letter dated February 24, 1984, plaintiff initiated a grievance procedure with the University's Senate Committee on Faculty Relations. At the suggestion of the Chairman of the Mediation Committee handling the grievance, defendant Frantz agreed to transfer plaintiff to the Rare Book Department if plaintiff so desired. Plaintiff agreed to this transfer and it was effective July 1, 1984. By a letter dated July 4, 1984, defendant Frantz informed the plaintiff that he had decided to change plaintiff's three-year renewable faculty appointment to a one-year renewable faculty appointment. In October, 1986, plaintiff initiated by letter a second grievance procedure with the Senate Committee on Faculty Relations, complaining of the shift in his case from a three-year to a one-year faculty contract. In November, 1986, plaintiff communicated with the Joint Legislative Audit and Review Commission (JLARC) of the Virginia General Assembly concerning allegedly questionable practices involving the procurement of materials for Alderman Library.

During January, 1987, defendant Barclay, plaintiff's supervisor in the Rare Book Room, presented him with an evaluation indicating serious problems with plaintiff's job performance. Defendant Frantz also informed plaintiff in March, 1987, that there were continuing concerns about the quality of his work. On June 29, 1987, defendant Frantz wrote a letter to plaintiff indicating that he would not recommend renewal of plaintiff's contract beyond its expiration date of June 30, 1988. Plaintiff then lodged a third grievance, again complaining of the action by Frantz in his case. Plaintiff brought the instant action on September 28, 1987, alleging that he was terminated "in retaliation for exercising his rights under the first amendment to the United States Constitution to pursue his grievance against defendant Frantz with the University of Virginia Faculty Senate Committee and to report information to an agency of the Virginia General Assembly." Complaint, para. 1, pp. 16–17.

For organization's sake, plaintiff's claim of retaliatory discharge will be evaluated first in reference to his pursuit of the University of Virginia's employee grievance procedures and, second, in reference to his reporting to JLARC.

Regarding plaintiff's first claim, this court finds that, as a matter of law, plaintiff's pursuit of the grievance procedures in the context of this case does not constitute protected speech because it fails to meet the threshold criterion of "public concern." With reference to plaintiff's allegation that his communication with JLARC was a factor in his retaliatory discharge, this court is not able to discover any material fact as to an issue in genuine dispute which would justify this action proceeding to trial.

In analyzing *infra* in more detail the two claims asserted by the plaintiff, it must be remembered that such analysis, and the decisions flowing from it, is limited to the record before the court.

## II. *Plaintiff's Use of the University of Virginia Grievance Process*

■ Plaintiff claims that one of the two motivating reasons for his discharge was that he utilized University of Virginia grievance procedures and that, therefore, his termination violated his free speech rights protected under the first amendment of the United States Constitution. The court's initial inquiry into this area must be whether the plaintiff's utilization of the University of Virginia grievance procedures constituted protected speech.

The controlling case on the contours of inappropriate discharge in retaliation for the exercise of free speech rights is *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In that case, an assistant district attorney circulated among her fellow employees a questionnaire concerning office morale and office procedures. Only one of the thirteen questions dealt with an issue of public concern. But, because the timing of the questionnaire and its circulation had an appreciably deleterious affect on the functioning of the office, the Supreme Court found that "the limited First Amendment interest involved

here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment." *Id.* at 154, 103 S.Ct. at 1694.

The Supreme Court held that when the claim involves employees speaking on matters of personal interest, a federal court should not undertake to review the personnel decisions of a public agency.

> When employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Id.* at 146–47, 103 S.Ct. at 1690 (citations omitted). Whether the utterance which allegedly led to the retaliatory discharge meets the threshold criterion of "public concern" and thus qualifies for protected status is a question of law. *Id.* at 148 n. 10, 103 S.Ct. at 1691 n. 10. Merely because a comment is made within the employment context of a public agency is not sufficient to confer protected status on the speech. "To presume that all matters which transpire within a government office are a public concern would mean that virtually every remark—and certainly every criticism directed a public official—would plant the seed of a constitutional case." *Id.* at 149, 103 S.Ct. at 1691. For the court to have held otherwise would have meant that virtually every termination of an employee in a public agency, where speech was involved, would require some measure of judicial oversight, which at best would be an exceptionally cumbersome and expensive requirement.

Plaintiff relies in large measure on *Daulton v. Affeldt*, 678 F.2d 487 (4th Cir.1982), a decision from this circuit. Plaintiff alleges that this decision mandates that his utilization of the grievance procedure must be considered protected speech. In *Daulton*, the Fourth Circuit Court of Appeals held that a teacher's general comments concerning salary, maternity leave, and other benefits are "properly a matter of public interest" and the speaker is thus protected from retaliatory discharge. *Id.* at 491. The plaintiff's comments there involved general criticism in these areas; it was not limited to the teacher's particular personal interest in securing changes which would benefit her alone. Thus, plaintiff's reliance on *Daulton* is misplaced. First, it is a 1982 case from this circuit, which means that whatever effect it may have had to extend the limit of protected speech in the workplace must be read in light of the Supreme Court's *Connick* opinion the following year.

Second, there is a factual dissimilarity between the speech at issue in *Daulton* and the speech involved in the plaintiff's use of University of Virginia grievance procedures. Appellee in *Daulton* was speaking on matters in which she had a personal interest. However, as noted, she did so within the context of a more general critique of the administrative structure and policies of the college in which she taught. That is, she spoke out on these matters in the context of a critique of administration policy, and the comments were not solely addressed to the parameters of her own situation. For example, the court noted that "on the factual data sheet, Daulton expressed her concern that the administration of the college was unreceptive to the students' needs and was not responding to the community. Such broadly based comments are protected as general criticisms of a public institution." *Id.* In contrast, the instant plaintiff's comments are motivated by and are directed at his own personal employment situation. It is not suggested in the record that his criticism of Alderman Library administrative decisions has as its motivation a concern about public policy or that his particular criticism could

have anything more than the most tangential policy implications. There are indications that plaintiff employed the grievance procedure primarily as a threat in order to harass defendants. Deposition of Ray Frantz, February 15, 1988, pp. 17–18.

The speech which forms the first part of plaintiff's claim is more akin to the speech undertaken in *Connick* than it is to the speech in *Daulton*. The distinction developed in *Connick* and *Daulton* is not mere logic-chopping nor is it a distinction without a difference. It is not only a workable standard, but utilizes a sound conceptual distinction which is reflected in an ecumenical range of first amendment theories. Not only does plaintiff fail to find specific cases to support his contention that the way he used the University of Virginia grievance procedures was protected speech, but he would be hard pressed to point to a theoretical basis for why his speech should be protected. Plaintiff's alleged protected activity consisted not of any general policy critique of the grievance procedures nor of any attempt to illustrate other examples of putative injustice in that grievance procedure. Whether one has recourse to a theory which more narrowly construes the first amendment as protecting only explicitly political speech,[1] adopts the more expansive "marketplace of ideas,"[2] or "self-governance" and town-meeting model,[3] or even invokes the broad rationale of autonomy and self-fulfillment,[4] one could find little theoretical shelter for the instant plaintiff's claim. Even with *carte blanche* to choose among the panoply of first amendment theories, the plaintiff would be unable to anchor this claim to a conceptual foundation from which he could argue that the law ought to be changed.[5] This first portion of the plaintiff's case is disabled not merely by a technical or mechanical application of specific precedential rules, but because the contours of his speech activities in the grievance process simply do not fit within the species of speech which even the most catholic of the various theories would protect. The more expansive first amendment theories may well disagree with the holding of *Connick*, but even those theories wanting to extend the umbrella of the first amendment to respondent in *Connick* would not accommodate the instant plaintiff's speech in his use of the grievance process, for that speech activity was solely self-referential. Speech about a grievance structure could conceivably fall into the protected category,[6] but plaintiff's speech in the grievance process is much further from being a matter of public concern than was respondent's speech in *Connick*, 461 U.S. at 149–50, 103 S.Ct. at 1691–92.[7]

1. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind.L.J. 1, 26–28 (1971).

2. *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

3. A. Meiklejohn, *Free Speech and Its Relationship to Self-Government*, 24–27 (1948).

4. *See, e.g.*, Scanlon, *A Theory of Freedom of Expression*, 1 Phil. & Publ Aff. 204, 213–218 (1972); Richards, *Free Speech and Obscenity Law: Toward A Moral Theory of the First Amendment*, 123 U.Pa.L.Rev. 45, 62 (1974). This is not to say that all theories of free speech share a clear, readily-identifiable area of convergence or that they do not conflict. However, even if "the only unity in the arguments for free speech may be in a family resemblance among the different forms of conduct they protect," one can still compare the scope of the umbrellas they offer. Rutherglen, *Theories of Free Speech*, 7 Oxford J.Legal Stud. 115, 123, 124 (1987). The point is that, under virtually any theoretical rubric, this plaintiff's speech in the grievance process will be outside the parameters of the various approaches indicated above.

5. Of course, this is not to suggest that statutory protection could not be created or that, under some circumstances, *state* constitutional protection might not be recognized for speech unprotected by the first amendment, *see, e.g.*, *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

6. For example, if speech about a public employee grievance structure was offered as a systemic critique of that structure, then such a claim might well require a different result.

7. Plaintiff's speech in utilizing the grievance procedures is clearly distinguishable from *Jackson v. Bair*, 851 F.2d 714 (4th Cir.1988), where appellant's speech dealt with security policies at a correctional institution, "obviously matters of fundamental and rightful public concern." *Id.* at 720.

In the facts of this case, plaintiff's utilization of the University of Virginia grievance procedures does not constitute protected speech and it cannot be the subject of a retaliatory discharge claim based on the first amendment. To recognize such a claim would trivialize the first amendment.

Further, plaintiff's claim is not salvaged by reliance on the recent Supreme Court case of *Rankin v. McPherson*, — U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), *reh'g denied*, — U.S. ——, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987). In *Rankin*, a probationary clerical employee in a county law enforcement office was fired after commenting to a fellow worker about the attempted assassination of President Reagan, "If they go for him again, I hope they get him." *Id.*, at ——, 107 S.Ct. at 2895. While the Supreme Court held that this employee's statement was protected by the first amendment and upheld the ruling by the Court of Appeals that this was an impermissible retaliatory discharge, the circumstances of *Rankin* and the instant matter are quite different. Rankin was a clerical worker addressing an issue of clear political dimensions, and, further, the Supreme Court found that the remark in question did not disrupt her office or the policies of that office and did not reflect negatively on that office.[8]

The Fourth Circuit has noted that even protected remarks may be part of the data used in weighing a tenure decision, if those remarks suggest that retention would seriously imperil the collegiality of an academic department. *Mayberry v. Dees*, 663 F.2d 502, 516–18 (4th Cir.1981), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982). This plaintiff was a professional, as a member of the University of Virginia's general faculty. Thus, the posture of deference described in *Connick* is especially appropriate in this setting. This concern carries even more relative weight when the speech in question does not deal with issues of public concern but relates only to a personal grievance.

The presence of a dispute within a public agency does not, *ipso facto*, elevate the remarks made in the context of that dispute to protected status. Not only may such remarks fail to exhibit the earmarks of protected speech but the logical extension of such an expansion would be to open myriad institutions to remarkably extensive litigation. Such intrusiveness would be especially problematic in the instance of academic institutions. In commenting on how garden-variety disagreements over working conditions or internal agency policy do not merit protected status, the Fourth Circuit, when analyzing a complaint which arose in the elementary school setting, concluded that

> Questions of this sort do not belong in federal court. They are best resolved by local school boards and individual school administrators. To accord to all such grievances the status of protected speech is to invite a measure of educational involvement that federal tribunals are ill-equipped to undertake.

*Daniels v. Quinn*, 801 F.2d 687, 690 (4th Cir.1986).

### III. *Plaintiff's Report to JLARC*

■ Since plaintiff's communication with the Joint Legislative Audit and Review Commission of the Virginia General Assembly dealt with matters of procurement policies and procedures by a public institution, speech on this topic may well be considered to be a matter of public concern. However, plaintiff is not able to point to a material fact genuinely in dispute supporting the JLARC portion of his allegations, and thus fails to make a case sufficient to withstand defendants' motion for summary judgment. In essence, on this area of his

---

**8.** Regarding the grievance procedures the question is the untoward elevation of some essentially private concerns to protected status and the concomitant expansion of judicial oversight which would result. Not every dispute rises to the level of a Platonic dialogue and not every perceived instance of unfairness rises to the level of a constitutional violation. To follow

*Connick* does not entail a reversion back to the position espoused by Justice Holmes who wrote, while still on the state bench, "The petitioner [a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 NE 517, 517 (1892).

complaint, plaintiff is able to do no more than to point to two bits of circumstantial evidence: he communicated with JLARC and subsequently a decision was made not to renew his contract. He is not able to produce additional facts which indicate a causal link between these circumstantial facts, nor is he able to point to disputed facts which could possibly establish such a causal link. Plaintiff in his complaint alleges that his discharge was motivated by his communication with JLARC (and his utilization of University of Virginia grievance procedures) and he repeats these allegations from the complaint in his memorandum of law in opposition to the defendants' motion for summary judgment. However,

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). The plaintiff has failed to go beyond the allegation of his pleadings in responding to the defendants' motion for summary judgment.

■ Much effort has been expended in the briefs and memoranda of the parties dealing with the burden of proof in this case. Essentially, the burden of proof in first amendment retaliatory discharge cases is initially on the plaintiff to show that his constitutionally-protected speech was a motivating factor in his dismissal. The burden of going forward then shifts to the defendant to show that the plaintiff would have been fired regardless of his protected speech. *Daulton*, 678 F.2d at 492. This follows the leading retaliatory discharge case of *Mount Healthy City Board of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), where the Supreme Court placed the burden of proof on the respective parties in this way:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that his conduct was a "substantial factor"—or put in other words,

that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (citations omitted). The Fourth Circuit has faithfully followed these precepts in a number of cases, as exemplified in *Daniels, supra.*

Here, the plaintiff has failed to make this initial showing. No burden will shift because the plaintiff has produced nothing beyond his bare pleadings to indicate that his speech was a motivating factor in his termination. Plaintiff himself has expressed doubt that his communication with JLARC was a motivating factor in his termination. For example, plaintiff believes that in 1984, approximately two years before plaintiff's communication to JLARC, defendant Frantz had already intended to terminate him. Deposition of Roger Leachman, p. 38, February 22, 1988. Plaintiff went on to testify that he believes defendant had "sufficient reason in both instances to seek to terminate me," and "I think that he would have tried to terminate me on the basis of the grievance alone, probably, but that's purely speculation." *Id.* at p. 41. Plaintiff indicates serious doubt about whether his communications with JLARC were a "but for" cause of his termination. As drawn from facts recited in plaintiff's complaint, there is a substantial basis for plaintiff's belief that he would have been discharged in any event. At least as early as February, 1984, there was dissatisfaction with plaintiff's work, as evidenced by the action of Frantz in relieving the plaintiff as Director of Reference Services and giving him a reassignment as Senior Reference Librarian. This action took place before the filing of any grievances and long before any communication of the plaintiff with JLARC. Such dissatisfaction with plaintiff's work continued, as shown in the letter decision of July, 1984, where Frantz

advised plaintiff of the Frantz decision to change plaintiff's three-year renewable faculty appointment to a one-year such appointment. This July, 1984, action followed the filing of plaintiff's initial grievance, but was, again, two years before the plaintiff's communication with JLARC. While plaintiff asserted that "it seemed to be common opinion in the library" that he was the JLARC source, he can do no more than insist that he believes defendant Frantz thought him to be the JLARC source because he stopped speaking to him and displayed examples of "alteration in behavior." *Id.* at p. 164.

Not only is plaintiff not able to point to material facts in genuine dispute, as distinguished from allegations in the complaint, which would establish a causal link between his communication with JLARC and his termination, but plaintiff admits that he has no evidence that defendants Barclay and Frantz believed that he was the JLARC source or that they discussed among themselves the possibility that he, plaintiff, was the JLARC source. *Id.* at p. 170. Such an admission compels a conclusion that there is no evidence to show a genuine dispute as to a material fact, i.e., the communication of plaintiff with JLARC as a motivating factor in bringing about the adverse personnel action.

The only portion of plaintiff's showing regarding his communication with JLARC and its connection to his termination to which plaintiff can point as supporting his claim is his belief that defendants suspected that plaintiff was the JLARC source. Plaintiff developed this suspicion because "I was the only one he [Barclay] didn't talk to about it, I wasn't even told when the auditors were there," and "I would say from the outward behavior of everybody on the staff it was clear that they all suspected me. They immediately ceased, they immediately altered their behavior towards me." *Id.* at pp. 156, 160. In support of

this suspicion, plaintiff can cite nothing more than his own somewhat vague perceptions quoted *supra*. Such subjective perceptions are not supported in the record before the court by any evidence and are in fact no more than a more detailed recitation of the allegations of the complaint.

Plaintiff asserts in his complaint and various memoranda that his communication with JLARC was a motivating factor in his nonrenewal. This is supported on the plaintiff's side by no more than his bare pleadings, and not by affidavits or otherwise as provided in the Rule setting forth "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e). Such a posture is not sufficient for plaintiff to survive the motion for summary judgment. While alluding in oral argument to other facts and a mass of evidence to be adduced at trial, plaintiff was able to point to no facts in the record before the court which would establish that there is a genuine issue in regard to any material fact. Plaintiff has failed to offer anything more than a *post hoc propter hoc* argument. In assessing allegations of retaliatory discharge in a case of denial of tenure, the Fourth Circuit noted that, "if the *possibility* of retaliation were all [the plaintiff] had to prove to allow a jury to find in his favor, there would be no practical way to deny tenure to anyone." *Mayberry*, 663 F.2d at 518, n. 36.[9]

The Fourth Circuit, in deciding the case of *Jones v. Dodson*, identified motivation as the threshold issue in discharge cases. 727 F.2d 1329 (4th Cir.1984). The court held that the inquiry into motivation is a factual one. *Id.* at 1336. The court concluded that "where, as here, the evidence raises genuine issues as to actual reason for an employee's discharge, that motivational issue must of course be resolved by the trier of fact." *Id.* at 1337. Here, however, plaintiff has failed to identify any facts in the record before the court which

---

**9.** There are several differences between the *Mayberry* case and the present action: e.g., this action involves non-renewal, not tenure, and the criterion here is for a summary judgment, not a directed verdict. Nevertheless, there are similarities between summary judgment and a directed verdict and those points of analogy only serve to highlight the chimerical quality of the case presented by this plaintiff. 10 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2713.1 (1983).

968

would raise genuine issues concerning motivation beyond the unadorned allegations found in the pleadings themselves.

In resolving the issue raised by a motion for summary judgment, there must necessarily be a consideration of the evidence before the court. The very wording of the rule, in referring to "material facts," mandates such a consideration. Embarkation on this course is undertaken with full recognition of the difficult substantive complexities of the effort. As the Fourth Circuit has recently stated, "But, as is often the case in constitutional litigation, these ultimate issues of constitutional law inevitably embrace subsidiary issues of pure historical fact...." *See, Jackson v. Bair,* 851 F.2d at 718. While the court then was speaking of the inquiry necessary to an appropriate balance of competing interests, the quotation is no less apt in considering the motion for summary judgment.

The court thus undertakes to review the record on this prong of the plaintiff's case in close detail. Such review makes it apparent that there is no genuine issue as to any material fact. As is so often the case in the unlawful employment termination cases, the one material fact as to which the plaintiff asserts the existence of a genuine issue is the question as to the reason for plaintiff's termination. Certainly, this question relates to a material fact. Thus, the court must determine from the record before it if a genuine issue on this question is presented.

On this point, the defendants' evidence is clear that neither the grievance procedures nor the JLARC communication played any part in the decision to terminate the plaintiff, as that evidence is drawn from the deposition testimony of defendants Frantz, Barclay, and Stubbs. This testimony is buttressed by various objective facts not in dispute, such as the timing of various disciplinary actions, less than termination, undertaken by defendants toward plaintiff, occurring before any communication by plaintiff to JLARC.

Contrasted to this pattern shown in defendants' evidence is that of the plaintiff. Drawing on the facts of termination and plaintiff's communication with JLARC, plaintiff asserts a nexus between the two leading to his termination. Plaintiff attempts to support his conclusion by reference to a change in attitude of the defendants toward him. Aside from its purely subjective nature, plaintiff's conclusion here is weakened to the vanishing point for purposes of summary judgment by the admission that he can point to no facts that demonstrate that defendants knew of his JLARC communication before deciding on plaintiff's termination. Deposition of Roger Leachman, February 22, 1988, p. 170.

The testimony of plaintiff and of defendants on this point is subjective, but defendants have supported their subjective evidence with objective factual material, as indicated. Plaintiff has not done this, relying instead on his impressions of a change in defendants' attitude toward him. Had plaintiff produced even one witness who could testify to having observed as an objective matter this change in attitude, a different result might well have flowed from this review of the evidence. On this consideration of the evidence, the court cannot conclude that a genuine issue of pertinent material fact exists.

This court is cautious about granting summary judgment unless it is absolutely clear that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. This natural caution is heightened in cases where state of mind is a determinative issue. *See, e.g., Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979). There the court referred to what it termed as a "maxim" that

summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense. This reflects a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving.

*Id.* at 414 (citations omitted). The well-taken posture of extreme caution about summary judgments in these cases where the state of mind is at issue does not result in a judicial inability ever to grant a summary judgment motion.[10] Determination of the state of mind may not be as straightforward an operation as assessment of direct physical evidence, but neither does it require a court to come to grips with the wholly ineffable. It is neither an indeterminate nor a semi-mystical inquiry. As the British jurist Lord Bowen observed,

> The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else. A misrepresentation as to the state of a man's mind is, therefore, a misstatement of fact.

*Edgington v. Fitzmaurice,* 29 Ch.Div. 459, 483 (1885). Since inquiry about the existence of a material fact in genuine dispute in this case need not lead into *terra incognita,* even though the court's approach must be a cautious one, the court determines that there is no material fact genuinely at issue in this case. As the Fourth Circuit has noted, "Unsupported allegations as to motive do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). Although the Fourth Circuit in that Title VII case reversed the summary judgment granted for the employer and took care to emphasize the spirit of special caution which courts must maintain in granting summary judgment in cases where state of mind is an issue, *Ross* was also equally careful in preserving the point that summary judgment could well be appropriate in a case where motivation is the crucial issue, but where the absence of a genuine dispute over material fact is also present. *Id.* at 364–65.

As indicated above, the court is deeply concerned about inadvertently depriving any party of a "day in court." None-theless, when the party moving for summary judgment has met the specified criteria, this court has no option but to grant such a motion. Defendants having demonstrated that summary judgment in their favor is warranted, the court will grant the motion of all of the defendants.

An appropriate Order shall this day issue.

**10.** The Fourth Circuit has recently recognized that while caution is necessary, "This does not mean that summary judgment is never, or even only rarely, appropriate to resolve constitutional issues. Of course it may be." *Jackson v. Bair,* 851 F.2d 714, 719 (citations omitted).